2015 OCT 26 AM 9: 17
COURT OF APPEALS DIV I

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 70862-7-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | PUBLISHED IN PART OPINION |
| | ) | |
| NATHANIEL SHANE CLARK, | ) | |
| | ) | |
| Appellant. | ) | FILED: October 26, 2015 |

SCHINDLER, J. — A jury convicted Nathaniel Shane Clark as an accomplice of attempted robbery in the first degree of the Union Bank in Kirkland and robbery in the first degree of the Banner Bank in Bellevue. The jury also convicted Clark of attempting to elude a pursuing police vehicle and felony hit and run. Clark contends the evidence does not support the jury finding that the principal had the intent to commit attempted robbery in the first degree or threatened the use of immediate force, violence, or fear of injury to commit robbery in the first degree. Clark also asserts the court improperly instructed the jury on the evidence of prior convictions and prosecutorial misconduct in closing argument denied him a fair trial. In a supplemental assignment of error, Clark relies on a recent Division Two decision, State v. Farnsworth, 184 Wn. App. 305, 348 P.3d 759 (2014), review granted, 183 Wn.2d 1001, 349 P.3d 856 (2015), to argue there is insufficient evidence of accomplice liability. We hold sufficient evidence supports the

jury conviction of attempted robbery in the first degree and robbery in the first degree, Clark was not denied his right to a fair trial, we disagree with the decision in Farnsworth, and affirm.

## FACTS

In February 2012, Nathaniel Shane Clark and John Kelly Reynolds were incarcerated at the Snohomish County Jail. Clark was serving time for a probation violation. Reynolds was charged with felony possession of a firearm with bail set at $35,000. Reynolds told inmates that if anyone could post bail and "help me get out of jail I'll pay 'em back by going in and walking in a bank and robbing it."

Clark obtained a bail bond for Reynolds after he was released in early February. Clark said he paid only $500 instead of $3,500 to post the bail bond.

> Well, I, you know, I paid 500 bucks for a $35,000 bail which is ridiculously cheap, you know. Usually, it's 10 percent of the bail, 3,500 bucks, you know. And I only paid 500 bucks and a signature. You know, I didn't put up any collateral or anything like that because Brandon [of Brandon's Bail Bonds] is a friend of mine. So, uh, you know, I, I figured that wasn't too big of a risk.

Reynolds was released on the bond on February 8. Reynolds believed Clark had paid $3,500 to post the bond. Reynolds assured Clark he would pay him back. Clark loaned Reynolds money to pay for a motel room in Everett.

On February 9, Clark and Reynolds went to the T-Mobile Store in Everett. Reynolds stole a display cell phone, "shot out of there," and returned to the car. Clark and Reynolds then drove to an apartment complex in Everett. While Clark visited a friend, Reynolds left and walked down the street to a Banner Bank.

Reynolds entered the Banner Bank in Everett wearing a black beanie "with a bill," sunglasses, a black jacket, black pants, and a "face covering." Reynolds handed the

bank teller a note that read: "Put the money in the bag. No dye packs or transmitter." The bank teller handed over approximately $1,500 or $1,600. Later that evening, Reynolds gave Clark approximately $1,200.

In the late afternoon of February 10, Clark drove Reynolds to a Banner Bank in Kirkland. Instead of parking in one of the open spaces designated for bank customers, Clark parked his black Chevrolet TrailBlazer across the street near "an abandoned building." Clark waited in the car with the engine running.

Reynolds testified that he intended to rob the Banner Bank because "Banner Banks are . . . smaller banks and they normally have two to three women in them. And a woman is more not to come after a man versus a man trying to be the hero." But after he noticed a male employee inside the bank, Reynolds decided to go to another small bank across the street, the Union Bank.

> Q So when you went to Kirkland, what bank did you intend to go into?
> A The Banner Bank.
> Q And is Banner Bank near another bank?
> A Yeah, it's across the street from Union Bank.
> Q Did you attempt to go in the Banner Bank or go in it?
> A Yeah, I walked up to the front door and seen a man standing at the podium and turned around and walked across the street.
> Q And why did you do that?
> A Banner Banks are smaller versions — they're smaller banks and they normally have two to three women in them. And a woman is more not to come after a man versus a man trying to be the hero.

Reynolds entered the Union Bank at approximately 4:48 p.m. Reynolds was wearing sunglasses with the black beanie pulled down on his forehead and a partial face mask, a black jacket, black pants, black gloves, and black shoes. Reynolds was carrying a black "folded up" bag. Reynolds wore a Bluetooth in his ear that was connected to a cell phone.

There was only one teller available. The teller was assisting a bank customer. Reynolds was next in line. Union Bank employee Btissam Saddi was working with an elderly couple at her desk. Saddi was immediately concerned "something was going to happen" because of "[t]he way [Reynolds] was dressed up . . . all black and he has sunglasses and I can see the teller . . . was kind of frightened too. The look. It was just the whole atmosphere" and that he looked "anxious." Saddi was frightened and alerted other bank employees that Reynolds was going to rob the bank.

Customer service manager Holly Jacobson approached Reynolds and offered to help him at a separate desk. Jacobson said she "didn't want [Reynolds] to get to the teller . . . [b]ecause I believed he was going to rob the bank." Reynolds told Jacobson to "go to [her] teller station." Jacobson "assured [Reynolds] that I could take his deposit at the desk on the platform." Reynolds raised his voice and repeated, "[G]o to your teller station." When Jacobson walked over to the platform desk, Reynolds "raised his voice quite a bit and motioned to the last teller station . . . and said go to your teller station." Jacobson did not go to the teller station. The customer Saddi was working with started "shaking and crying" and said, "I don't want to die." Reynolds left the bank. Jacobson called 911.

Steve McDivitt and Rusty Cahall were standing in the parking lot in front of Union Bank and a woman was walking her dog on the sidewalk. McDivitt testified Reynolds "jumped over the dog and then jumped over the shrubbery" and "headed across [the street] to the parking lot."

Cahall testified that Reynolds "flew out the door, jumped over the dog," crossed the street, and then "really stepped up the pace" to a "full blown run" toward the dark-colored Chevrolet TrailBlazer parked across the street. Cahall said Reynolds "slam[med]" the door of the TrailBlazer and the car "peeled out" and drove away "in a hurry" with the "tires squealing." Cahall testified there was no "delay between the time [Reynolds] ran into the car and the time that the car drove away . . . , it was quick as he could get in [the car] and gone."

Clark drove Reynolds to a Banner Bank in Bellevue. Although there were a number of open parking spaces in front of the bank, Clark parked down the street.

Reynolds walked into the Banner Bank at approximately 5:58 p.m. Reynolds was wearing a white shirt, black pants, black shoes, the black beanie hat, a black partial face mask, and black gloves, and was carrying a black bag. Reynolds wore a Bluetooth connected to a cell phone.

Bank employee Brenda Curtis was sitting at her desk in the lobby. When Reynolds entered the bank, Curtis immediately pushed the silent alarm button and "watched [Reynolds] to try to get the best description that I could . . . [b]ecause it appeared that he was going to rob the bank."

Tellers Jillian Clark and Jasmine Howell were at adjacent teller stations. When Jillian[1] saw Reynolds enter the bank, she told Howell, "[O]h, my God, we're getting robbed." Jillian "immediately started shaking" and she and Howell pushed the silent alarm. Jillian testified, "I didn't know what to do. The first thing I did I saw [Howell] reach for her security button and so I did the same thing."

---

[1] Because the teller and the defendant have the same last name, we refer to Jillian Clark by her first name for clarity.

Customer service manager Nicolene Buchanan was standing behind the teller stations. As Reynolds walked toward the tellers, Buchanan pressed a silent alarm. Buchanan said she "kn[e]w right away [Reynolds] was a robber based on his physical appearance."

Reynolds loudly told Buchanan to not push any alarm buttons. Buchanan asked him to take off his mask. Reynolds "looked at her" and said, "[D]on't push that button." Reynolds repeated, "Don't press any buttons."

Curtis testified it was "very clear" Reynolds was "trying to rob the bank." Curtis testified, in pertinent part:

> Well, it's — it's a little scary because they're addressing you to not do something that you're supposed to do. It's very clear that they're trying to rob the bank and they don't want the police there, they don't want you to set off alarms. So it's scary because you don't know at that point how far it could go.

Meanwhile, branch manager Sean Haugh dialed 911 from his office.

> I saw what was happening and I was watching the entire time, but I actually had lifted my hand set [sic] up and I called 911. And so I didn't pick up the handset to talk to them because that's very — with what's going on, but I had it on 911 and my phone was low and I just let it sit there.

Reynolds walked to Jillian's teller station and handed her a note written with a Sharpie marker in thick black ink. The note read: "Put the money in the bag. No dye packs or transmitter." Jillian said she "was very scared, I was shaking. I could hardly open my [drawer] or do anything." Jillian "fumbled with [her] keys" to open the teller drawer and handed Reynolds some but not all of the money in the drawer. Jillian testified, in pertinent part:

> I fumbled with my keys and was able to get my drawer open and gave him part of what was in my drawer. I don't really know what was going through

6

my head. I think the main thing was to try and minimize the loss to the bank and also just kind of nerves so I only gave him part of . . . the money in my drawer. . . . I had given him only the 20s, 10s, 5s, and 1s thinking that he would just not really realize I hadn't given him the 100s and 50s and that he would just leave.

Reynolds demanded Jillian hand over "the 100s and 50s." Jillian complied with his demand. Reynolds left the bank with approximately $900 in cash.

Police vehicles pursued the Chevrolet TrailBlazer in "very heavy" rush hour traffic. Several police vehicles activated patrol car emergency lights and sirens. Clark did not stop. At an entrance ramp to State Route 520, Clark accelerated and drove through the middle of two on-ramp lanes. The TrailBlazer collided with a number of vehicles including a silver Volkswagen hatchback. Bellevue Police Officer Scott Montgomery was "right behind" the TrailBlazer. Officer Montgomery estimated Clark was traveling at more than 50 m.p.h. After hitting the Volkswagen, Clark lost control of the TrailBlazer, crashed into a concrete barrier, and rotated into oncoming traffic before coming to a stop. Police officers arrested Clark and Reynolds.

Bellevue Police Detective Vittorio Mangione interviewed Reynolds at the hospital. After Detective Mangione read Reynolds his Miranda[2] rights, Reynolds agreed to talk to the detective. The interview was brief. Reynolds did not say much about what had happened or implicate Clark.

Detective Mangione and two FBI[3] agents then interviewed Clark at the police station. Clark agreed to record the interview. Clark said he met Reynolds "for the first time ever" a few days before in the Snohomish County Jail. Clark admitted paying $500 to obtain a bail bond for Reynolds and driving Reynolds to the T-Mobile store in Everett

_____

[2] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).
[3] Federal Bureau of Investigation.

on February 9. Clark said Reynolds stole a cell phone at the T-Mobile retail store. "I watched him do it. . . . I watched him pop the fuckin' phone[,] pop like the back off the phone. . . . And I seen him do that and walk right out." Clark also said Reynolds got together with his girlfriend after his release from jail in violation of a no-contact order.

Clark admitted driving Reynolds to the bank in Kirkland on February 10 because he wanted to get the money Reynolds owed him.

> [Reynolds] called, called, called and, uh, if I woke up, he's like, "Oh, man, you ought, you need to—I thought you were gonna take me to go get your money." I was like, "Yeah, you know, I want to get that money back 'cause," my girlfriend told me he's never gonna pay me back and he's gonna jump bail. And so, I was anxious and to, to do that and get that money back. So, I picked him up and, uh, took him, at, he said he had to go to the bank and, uh, he wanted to go to a bank in Kirkland.

Clark said Reynolds told him he had to go to a different Banner Bank. Clark said he used his cell phone to find directions to the Banner Bank in Bellevue. Clark said, "[F]inally, five minutes before this bank was supposed to close or something, uh, we pulled in there. And not even the bank though, in the place next to it."

[FBI Agent]: So, [Reynolds] comes out of the Kirkland Bank. And where's, where's he get in the car?

[Clark]: He got in . .

[FBI Agent]: The front seat?

[Clark]: Yeah.

[FBI Agent]: And he, what did he tell you again?

[Clark]: He said, "Hey, it don't work there. We gotta go to a different Banner Bank."

[FBI Agent]: And what did you take that to mean, "It didn't work there"?

[Clark]: I didn't mean, I didn't think it was there. I thought he meant that, you know, he had to go to a different bank. . . . He had

> to go to a bank in Redmond or a Banner Bank, I don't know.
> A Banner. He didn't say what bank it was, a Banner Bank,
> so I Googled it on my phone. Uh, Redmond Way, and it was
> close to Kirkland.

According to Clark, he did not know Reynolds planned to commit robbery at the Union Bank in Kirkland or the Banner Bank in Bellevue until after Reynolds returned from the Banner Bank in Bellevue, got in the backseat of the car, and started "taking clothes off." Clark told Detective Mangione and the FBI agents:

> I bet he did, you know what I mean? 'Cause whenever he got in, he got
> gloves on and he had like the hat pulled down or some shit. I don't know,
> he, I, I mean when he got in, I was like "Wow," you know.

Clark said Reynolds would confirm that he did not know Reynolds planned to rob the Union Bank or the Banner Bank.

> [Reynolds] better fucking tell you that I know nothing about this shit, you
> know what I mean? He better. I mean, or else he, he better go to fucking
> Federal Prison, and he better fuckin' watch his ass because if I get
> cracked over this shit, he's gonna be on, like Donkey Kong. He's gonna
> get fucked up in the County Jail and in prison, I promise you that.

After Reynolds was released from the hospital later that night, Detective Mangione and the FBI agents interviewed him at the police station. Reynolds agreed to record the interview. Reynolds identified himself in the photographs from bank surveillance video. Reynolds admitted that on February 9, he robbed the Banner Bank in Everett. Reynolds admitted that on February 10, he attempted to rob the Union Bank in Kirkland and robbed the Banner Bank in Bellevue.

Reynolds told Detective Mangione and the FBI agents, "[I]t's not that I don't want to just tell you everything. It's just that if I do, then there's certain situations, right, that individuals that I talk to you about would not like that much." However, after Detective Mangione told Reynolds that Clark said Reynolds stole the cell phone from the T-Mobile

9

store and violated a no-contact order, Reynolds said he had known Clark for two years and "Nathaniel knew everything."

Detective Mangione executed a warrant to search the Chevrolet TrailBlazer. The police seized five cell phones, a Bluetooth earpiece, a black bag, black gloves, the black clothing Reynolds wore during the bank robberies, a black Sharpie marker, and the robbery note written with the Sharpie pen. Detective Mangione said that he found the T-Mobile HTC cell phone near the driver's side floorboard. The HTC cell phone was registered to Clark with the cell phone number 425-301-3327. Detective Mangione found a T-Mobile Samsung cell phone in the backseat. The T-Mobile Samsung was registered to the Everett Mall T-Mobile retail store with the number 425-737-9443. A forensic analysis of the cell phones showed that on February 10, five calls were placed between the two cell phones during the attempted robbery at the Union Bank and the robbery at the Banner Bank in Bellevue.

The State charged Reynolds and Clark with robbery in the first degree of a financial institution and charged Clark with attempting to elude a pursuing police vehicle.

Reynolds pleaded guilty to robbery in the first degree of the Banner Bank in Everett on February 9, 2012; attempted robbery in the first degree of the Union Bank in Kirkland on February 10, 2012; and robbery in the first degree of the Banner Bank in Bellevue on February 10, 2012. The court imposed a high-end standard sentence of 171 months.

The State charged Clark by amended information as an accomplice to the attempted robbery in the first degree of the Union Bank and robbery in the first degree of the Banner Bank on February 10, and attempting to elude a pursuing police vehicle and felony hit and run.

A number of witnesses testified during the seven-day jury trial including Union Bank employees, McDivitt, Cahall, Banner Bank employees, Detective Mangione, the injured driver of the Volkswagen, and forensic analyst Michael Picinich. The court admitted into evidence a number of exhibits including surveillance video from the Union Bank in Kirkland and the Banner Bank in Bellevue, photographs from the videos, a redacted tape recording of the lengthy February 10 police interview with Clark, phone records for the cell phones found in the TrailBlazer, and redacted jail telephone calls between Clark and his girlfriend Estrellita Matias.

The State presented evidence showing Clark and Reynolds communicated by cell phone and used a police scanner application during the attempted robbery at the Union Bank and the robbery at the Banner Bank on February 10. Crime analyst Michael Picinich testified that two cell phones were in communication with each other at the exact time of the attempted robbery in Kirkland and the robbery at the Banner Bank in Bellevue and that the phones were in the same general area as the banks during the robberies.

The phone records show that between approximately 4:00 p.m. and 6:00 p.m. on February 10, 2012, the HTC cell phone that belonged to Clark received four calls from the T-Mobile Samsung cell phone that Reynolds stole the day before, and the Samsung cell phone received one call from the HTC phone. Picinich testified the Samsung phone

called the HTC phone at 4:41 p.m. and the call lasted 561 seconds, ending at 4:50 p.m. Surveillance video from the Union Bank in Kirkland shows Reynolds entering the bank at 4:48:10 p.m. and leaving at 4:49:05 p.m. Picinich testified the Samsung phone called the HTC phone again at 5:57 p.m. and the call lasted 194 seconds, ending at 6:00 p.m. Surveillance video from the Banner Bank in Bellevue shows Reynolds entering the bank at 5:58:05 p.m. and leaving at 5:58:49 p.m.

Detective Mangione testified that after Clark was arrested, he told Estrellita Matias that Reynolds said Clark was involved in the robberies. The State played redacted portions of the recorded conversations between Clark and Matias. In the recorded jail call on February 23, Matias tells Clark that the detective said Reynolds was "collaborating" with the police to avoid federal charges. Matias said Reynolds told the police that while he was in the bank, he used his Bluetooth and was "talking to you on the phone while you were in the car," and Clark was monitoring the police scanner while Reynolds was in the bank. Matias said the detective told her the police were going to use the cell phones to prove Clark was involved in the robbery. Matias said if Clark was on the phone while Reynolds was in the bank, Clark was an "accessory to the . . . robbery" because "you are inside the car with . . . the scanner telling him if the cops are coming." In response, Clark says, "That's bad." Clark then says, "There ain't no way that they can prove a . . . Bluetooth was used." Matias said, "Well they're gonna use . . . the phone records to see if you were on the phone with [Reynolds] at any point in time when he was in the bank." Clark admits he "probably was" on the phone.

In the next call, Clark says he "got some really bad bad news" that Reynolds "is cooperating fully with the FBI and the police." Matias said Reynolds tried to call her from jail the day before. Clark tells Matias the next time Reynolds called to take the call and tell him he is a "punk" because "he told the police every fucking thing." Clark tells Matias, "I'm gonna go to prison for a real long time."

In the next call, Clark said that he talked to Reynolds and Reynolds "swore up and down that he 'didn't say a fucking thing' " to the police. Clark tells Matias he "felt 'a lot better' about the situation." In the call on February 29, Clark says he saw his lawyer that day and told her to get a signed statement from Reynolds and that will "clear" him. Clark said he told his lawyer that he saw Reynolds "the other day" in jail and Reynolds "wants to do that, he's gonna do that, he needs to do that." Clark said, "We just need to have someone go visit him" and have Reynolds "write that letter." Clark said he read the statement Reynolds gave to police saying Clark was on the cell phone with him and monitoring the police scanner application while Reynolds was in the bank.

In the final call on March 5, Matias tells Clark she got a phone call from Reynolds and gave him her address "so he can write that . . . letter . . . and send it." According to Matias, other inmates were approaching Reynolds and telling him that Clark said he "snitched" on Clark. Reynolds denied "saying nothing like that." Matias said she told Reynolds that Clark was depending on him to write a letter.

Detective Mangione testified that when he interviewed Reynolds after March 5, Reynolds "changed his story — recanted his initial version of what happened."

Reynolds testified on behalf of the defense. Reynolds told the jury, "I'm here to set the record straight." Reynolds testified that he pleaded guilty to attempted robbery of the Union Bank and robbery of the Banner Bank on February 10. Reynolds testified he did not believe robbing a bank was "such a serious offense." Reynolds said the State "offered me 151 months if I could implicate my co-defendant" but he refused.

Reynolds testified he asked Clark for a ride to the bank on February 10 because he thought Clark had paid $3,500 to post bail, and "I figured I owed him the money." Reynolds said he was "smoking meth" and Clark was "smoking spice." Reynolds testified that he never discussed "robbing banks" with Clark. Reynolds admitted asking inmates to "help me get out of jail" and saying he would pay the money back by "walking in a bank and robbing it," but testified that Clark had "already left by then."

According to Reynolds, Clark did not know that he planned to rob the Union Bank or robbed the Banner Bank in Bellevue. Reynolds testified that when he returned to the car after leaving the Union Bank in Kirkland, Clark was "still on his phone arguing" with Matias. Reynolds testified he told Clark that "this bank right here I couldn't — I wasn't able to withdraw any money from this bank." Reynolds said he told Clark, "I need another Banner Bank. Can you — is there any way that you can Google map again and find me another Banner Bank."

Reynolds testified that after he robbed the Banner Bank in Bellevue and returned to the car, Clark was "preoccupied" and did not "ask me anything." According to Reynolds, Clark did not know he had robbed the bank until "we were driving down the road and I noticed the speedometer and he's speeding." Reynolds told Clark, "[H]ey, man, you might want to slow down." Reynolds testified Clark "[t]hen . . . turns and looks

in the back seat and see [sic] me with a waist full of money or a lap full of money and then he really sped."

On cross-examination, Reynolds admitted that on February 9, he gave Clark more than $1,000 from the robbery at the Banner Bank in Everett. Reynolds said that on February 10, the police scanner application "was making noise in the car" during both the attempted robbery at the Union Bank and the robbery at the Banner Bank. Reynolds said that "the Bluetooth [he was] wearing during these robberies . . . was covered by the face covering . . . [s]o the bank tellers couldn't see the Bluetooth that [he] had in [his] ear." Reynolds testified that the Bluetooth was connected through a cell phone in his pocket to "another phone in the vehicle . . . sitting on a console between the two seats." Reynolds testified that if he were to "go to prison with a snitch jacket, . . . that's not good." Reynolds told the prosecutor, "I'm not testifying for you. I'm here testifying for them, okay."

Reynolds testified he lied to Detective Mangione when he said Clark "knew everything" about the attempted robbery at the Union Bank and the robbery of the Banner Bank because he was angry that Clark told the police about violating the no-contact order and stealing the cell phone from the T-Mobile store.

> I was — I briefly — I was told that [Clark] had said something about my no contact order with my ex-girlfriend and a stolen phone, and then I was just basically okay, so this is where we stand.
> Q     So is it fair to say you were mad at him at that point?
> A     Oh, yeah. I was really pissed off.
> Q     And we're talking about robbery. Are you saying that you were more pissed off about the information on the phone and no contact order?
> A     Yeah.
> Q     Why is that?
> A     Because that was just other crimes on top of the robberies.

> Q    And did that change your — change anything about what
> you did — have any influence on what you told Detective Mangione?
> A    Oh, yeah.  Most definitely.
> Q    And what do you recall telling Detective Mangione at that
> point?
> A    That Nathaniel knew everything.

When asked why he told Detective Mangione that he had known Clark for two years, Reynolds said he was "embarrassed" and "didn't want to sound like oh, I just involved this guy I just met in a bunch of robberies."

Clark testified.  Consistent with the tape-recorded police interview, Clark admits he had prior convictions but denied ever committing robbery.

> I'm a convict, you know.  I mean locked up my whole life and shit.
> . . . .
> I never robbed nothing.  I've never—I mean, I might have had a lot of
> damn felonies in my, you know, for drugs and fighting and all kinds of shit
> when I was younger but I've never, I never robbed nothing.
> . . . .
> But I'm not a stupid guy.  I'm, I'm not gonna go to prison for—yeah, I've
> got like nine felony points, you know what I mean?  If I do anything, if I
> piss on the sidewalk, I'm going to prison for five years.  I'm not a stupid,
> fucking guy, you know what I mean?  There's a lot of shit that I can do.  I
> would never rob a bank.
> . . . .
> [Y]ou know, I can either be this hardass gangster, fucking go to prison and
> do this convict shit I've been doing my whole fucking life, or else I can get
> real, real, real with you guys right now and tell you about what's going on
> with me and what happened, and that's what I'm doing.

Clark testified that Reynolds' brother asked him to post bail.  Clark said Reynolds stole a cell phone from the T-Mobile Store in Everett on February 9 and gave him approximately $1,200 later that day.  Clark testified that while he waited in the car for Reynolds, he was on the phone with Matias.  On cross-examination, the prosecutor impeached Clark with prior convictions for dishonesty.

16

On rebuttal, Detective Mangione testified that on February 10 between 4:44 p.m. and 6:05 p.m., "there were no answered calls from . . . Matias's phone to the phone identified as Clark." The phone records showed that when Matias called Clark at 5:57 p.m., 5:58 p.m., 5:59 p.m., and 6:03 p.m., the calls went to voicemail each time.

In closing, the State argued Clark was guilty as an accomplice to attempted robbery at the Union Bank and robbery of the Banner Bank on February 10, 2012. The State argued neither the testimony of Reynolds nor Clark was credible. The State argued Reynolds was afraid of Clark and would do "anything he can to try to undo the damage that he felt he did by telling the truth."

The defense emphasized it was up to the jury to decide credibility. The defense argued the State did not prove accomplice liability because Clark did not know Reynolds committed the crimes of attempted robbery and robbery until after the Banner Bank robbery in Bellevue. The defense argued the jury should believe what Clark told police during the tape-recorded interview because "men with this kind of history don't talk to the police when they're guilty."

During deliberations, the jury asked to listen to the first "30 minutes to 45 minutes" of Clark's interview with the police and the recorded jail calls between Clark and Matias. The court played the interview and jail calls for the jury in open court.

The jury found Clark guilty as an accomplice for the attempted robbery in the first degree at the Union Bank and robbery in the first degree at the Banner Bank. The jury found Clark guilty of attempting to elude a police vehicle and felony hit and run.

The State requested an exceptional sentence of 200 months. Clark asked the court to impose the same sentence as Reynolds, 171 months. At sentencing, Clark accepted responsibility as an accomplice to the crimes of attempted robbery of the Union Bank and robbery in the first degree of the Banner Bank, and attempting to elude and felony hit and run. Clark told the court, in pertinent part:

> I do recognize the impact that crimes against financial institutions create as well as the tendency for things to escalate into something violent and dangerous. I would like to be able to express my remorse to the bank tellers and to the public who felt threatened by this action. I am deeply sorry for the injuries to [the driver of the Volkswagen]. He was hurt and caused great inconvenience in his life, and I am directly responsible for this. No matter how great or how small, my actions are liable for the injuries that happened that day.
> I see the verdict of society making a statement, a statement that any involvement to any degree of this behavior is socially unacceptable. I accept the responsibility. I have great remorse for my participation in this wrongdoing.

The court rejected the request for an exceptional sentence. With an offender score of 12, the court imposed a high-end standard range sentence of 171 months.

## ANALYSIS

### Attempted Robbery and Robbery in the First Degree

Clark contends insufficient evidence supports finding him guilty of attempted robbery in the first degree of the Union Bank in Kirkland and robbery in the first degree of the Banner Bank in Bellevue.

The State has the burden of proving the elements of a crime beyond a reasonable doubt. In re Winship, 387 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); State v. Borrero, 147 Wn.2d 353, 364, 58 P.3d 245 (2002). In reviewing a sufficiency of the evidence claim, we view the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt. State v. Witherspoon, 180 Wn.2d 875, 883, 329 P.3d 888 (2014); State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). A challenge to the sufficiency of the evidence admits the truth of the State's evidence. Witherspoon, 180 Wn.2d at 883. "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." Salinas, 119 Wn.2d at 201. We defer to the trier of fact on "issues of witness credibility." Witherspoon, 180 Wn.2d at 883.

A person is guilty of robbery in the first degree if "[h]e or she commits a robbery within and against a financial institution." RCW 9A.56.200(1)(b). RCW 9A.56.190 defines the crime of robbery as follows:

> A person commits robbery when he or she unlawfully takes personal property from the person of another or in his or her presence against his or her will by the use or threatened use of immediate force, violence, or fear of injury to that person or his or her property or the person or property of anyone. Such force or fear must be used to obtain or retain possession of the property, or to prevent or overcome resistance to the taking; in either of which cases the degree of force is immaterial. Such taking constitutes robbery whenever it appears that, although the taking was fully completed without the knowledge of the person from whom taken, such knowledge was prevented by the use of force or fear.

" 'Robbery encompasses any taking of . . . property [that is] attended with such circumstances of terror, or such threatening by menace, word or gesture as in common experience is likely to create an apprehension of danger and induce a man to part with property for the safety of his person.' " Witherspoon, 180 Wn.2d at 884[4] (quoting State v. Shcherenkov, 146 Wn. App. 619, 624-25, 191 P.3d 99 (2008)). We use an objective test to determine whether "the defendant used intimidation" and "an ordinary person in the victim's position could reasonably infer a threat of bodily harm from the defendant's

---

[4] Emphasis in original, alterations in original, internal quotation marks omitted.

acts." Witherspoon, 180 Wn.2d at 884. A threat can be communicated "directly or indirectly" and a threat of immediate force may be implied. RCW 9A.04.110(28); Shcherenkov, 146 Wn. App. at 624. The controlling question is whether a jury could conclude that under the circumstances, a reasonable person would have felt sufficiently threatened to accede to the written demand to turn over the money. "Any force or threat, no matter how slight, which induces an owner to part with his property is sufficient to sustain a robbery conviction." State v. Handburgh, 119 Wn.2d 284, 293, 830 P.2d 641 (1992).

## Attempted Robbery in the First Degree of the Union Bank in Kirkland

Clark asserts insufficient evidence supports finding the intent to commit attempted robbery in the first degree.[5] To convict a defendant of attempted robbery in the first degree of a financial institution, the State has the burden of proving beyond a reasonable doubt that the defendant intended to commit a robbery and that he or she engaged in "any act which is a substantial step toward the commission of that crime." RCW 9A.28.020(1). Clark concedes Reynolds took a substantial step but argues the State did not prove intent to commit robbery in the first degree at the Union Bank. We disagree.

---

[5] The State charged Clark as an accomplice to attempted robbery in the first degree. The information states, in pertinent part:

> That the defendant NATHANIEL SHANE CLARK . . . , on or about February 10, 2012, did attempt to unlawfully and with intent to commit theft take personal property of another, to-wit: U.S. currency, from the person and in the presence of another, against his/her will, by the use or threatened use of immediate force, violence and fear of injury to such person or his/her property and to the person or property of another, and that he did commit the robbery within and against a financial institution . . . , to-wit: Union Bank; attempt as used in the above charge means that the defendant committed an act which was a substantial step towards the commission of the above described crime with the intent to commit that crime.

Reynolds entered the Union Bank at approximately 5:00 p.m. on Friday, February 10, wearing dark sunglasses and a black mask that "covered his chin, went down and covered his neck," and carrying a black bag. Reynolds was dressed in "all black" including black plants, a black jacket, black shoes, black gloves, and a black beanie hat pulled over his forehead. Customer service manager Holly Jacobson "believed [Reynolds] was going to rob the bank" and intercepted Reynolds to prevent him from reaching the teller. Reynolds "demand[ed]" Jacobson go to her teller station. Jacobson was "[a]larmed" and "shaking." Jacobson testified, "The first time was instructions. He didn't ask me, he said go to your teller station. Kept his chin down, kept his voice low. . . . The second time his voice was a little bit more raised . . . [and] that final time he raised his voice quite a bit." After the last demand, an elderly bank customer began "shaking and crying and saying I don't want to die, I don't want to die."

Reynolds admitted he attempted to commit robbery at the Union Bank. Reynolds testified that he pleaded guilty to attempted robbery of the Union Bank and robbery in the first degree of the Banner Bank. Reynolds testified that he was "doing more then merely preparing for a robbery" at the Union Bank in Kirkland, he "intended to rob that bank." Substantial evidence supports the jury finding Reynolds intended to commit attempted robbery in the first degree of the Union Bank.

Robbery in the First Degree of the Banner Bank in Bellevue

Clark asserts insufficient evidence supports finding Reynolds used or threatened to use force, violence, or the fear of injury to support the conviction of robbery in the first

21

degree of the Banner Bank because there was no evidence he carried a weapon.[6] We disagree, and hold that under the circumstances, a rational jury could reasonably conclude that Reynolds made an unequivocal demand " 'by menace, word or gesture as in common experience . . . likely to create an apprehension of danger' " for the immediate surrender of the bank's money unsupported by any pretext of lawful entitlement. Witherspoon, 180 Wn.2d at 884[7] (quoting Shcherenkov, 146 Wn. App. at 624-25).

Reynolds entered the Banner Bank in Bellevue at 5:58 p.m. right before closing wearing black pants, a black hat, black gloves, a black mask, and carrying a black bag. Customer service manager Nicolene Buchanan testified that she immediately pushed the silent alarm as Reynolds approached the teller station. Teller Jillian Clark testified that when she saw Reynolds enter the bank in "a full ski mask," she "immediately

---

[6] The State charged Clark as an accomplice to robbery in the first degree. The information states, in pertinent part:

> That the defendant NATHANIEL SHANE CLARK . . . , on or about February 10, 2012, did unlawfully and with intent to commit theft take personal property of another, to-wit: U.S. currency, from the person and in the presence of Nicki Buchanan, against her will, by the use or threatened use of immediate force, violence and fear of injury to such person or her property and to the person or property of another, and that he did commit the robbery within and against a financial institution . . . , to-wit: Banner Bank.

Jury instruction 11 states, in pertinent part:

> To convict the defendant of the crime of robbery in the first degree, as charged in count I, each of the following six elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about February 10, 2012, the defendant or an accomplice unlawfully took personal property from the person or in the presence of another;
> (2) That the defendant or an accomplice intended to commit theft of the property;
> (3) That the taking was against the person's will by the defendant's or an accomplice's use or threatened use of immediate force, violence or fear of injury to that person or to that person's property or to the person or property of another;
> (4) That force or fear was used by the defendant or an accomplice to obtain or retain possession of the property or to prevent or overcome resistance to the taking;
> (5) That the defendant or an accomplice committed the robbery within and against a financial institution; and
> (6) That any of these acts occurred in the State of Washington.

[7] Emphasis omitted, internal quotation marks omitted.

started shaking," turned to the teller next to her and said, "[O]h, my God, we're getting robbed," and pushed the silent alarm. Personal banker Brenda Curtis testified it was "very clear" Reynolds was "trying to rob the bank" and he did not "want the police there" or "want you to set off alarms." Curtis said it was "scary because you don't know at that point how far it could go." When he "saw what was happening," branch manager Sean Haugh immediately dialed 911 from his office.

Reynolds "command[ed]" Jillian and Buchanan not to push any alarm buttons and "said it loud enough for everybody to hear, don't press any buttons." When Jillian did not respond, Reynolds repeated his demand. Reynolds gave Jillian a note stating, "No dye packs or transmitter." Reynolds "command[ed]" Jillian to not put any dye packs in with the money. After Jillian gave Reynolds small bills, Reynolds "demanded more money." Jillian testified she followed bank policy by handing over the money but "was very scared, I was shaking. I could hardly open my [drawer] or do anything." Haugh testified Jillian and Buchanan "were both visibly shaking."

Viewing the evidence in the light most favorable to the State, the jury could find Reynolds obtained the money from the Banner Bank teller by the use of force, violence, or the fear of injury.

Accomplice Liability

In a supplemental assignment of error, Clark relies on State v. Farnsworth, 184 Wn. App. 305, 348 P.3d 759 (2014), review granted, 183 Wn.2d 1001, 349 P.3d 856 (2015), to argue insufficient evidence supports finding Clark acted as an accomplice because the State did not prove Reynolds made an implied threat to use force,

23

violence, or fear of injury to obtain money from the financial institutions. We disagree with the analysis in Farnsworth.

In Farnsworth, the court held insufficient evidence supported finding an implied threat to obtain money from the bank teller. The court vacated the robbery conviction of the accomplice and remanded for sentencing on theft in the first degree. Farnsworth, 184 Wn. App. at 307-14. The court in Farnsworth concluded that because there was no evidence of a weapon and the principal "did not insinuate that he would take further action if the teller did not comply with the note's instructions," "simply hand[ing] over a note instructing the teller to 'put the money in the bag' " does not prove an implied threat to commit robbery in the first degree. Farnsworth, 184 Wn. App. at 312.

The dissent disagreed with holding "as a matter of law, a person does not commit a robbery" by handing a bank teller a note demanding money "to which he has no conceivable claim." Farnsworth, 184 Wn. App. at 314-15 (Worswick, J., dissenting). We agree with the dissent.

The decision in Farnsworth ignores the standard of review for sufficiency of the evidence. The test to assess the sufficiency of the evidence is " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact' " could have found the essential elements of the crime beyond a reasonable doubt. State v. Green, 94 Wn.2d 216, 220-21, 616 P.2d 628 (1980)[8] (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). "[T]he standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." Jackson, 443 U.S. at 324 n.16. We agree with the dissent that "a rational trier of fact could reasonably infer" that a "naked demand" to the bank teller for

---

[8] Emphasis in original.

money "unsupported by any claim of right" and the defendant's conduct "implied a threat." Farnsworth, 184 Wn. App. at 316-17 (Worswick, J., dissenting). The principal McFarland entered the bank wearing a wig and "dark sunglasses" and " 'acting all fidgety.' " Farnsworth, 184 Wn. App. at 317 (Worswick, J., dissenting). When he approached the teller station, McFarland "kept his arms crossed" and "leaned over the counter" toward the teller. Farnsworth, 184 Wn. App. at 317 (Worswick, J., dissenting). The teller testified she complied with the demand for money because "she 'didn't want anybody else to get harmed' " and " 'didn't know what he was capable of doing.' " Farnsworth, 184 Wn. App. at 317 (Worswick, J., dissenting).

Further, contrary to the assertion of the majority in Farnsworth, obtaining money from a bank by "wearing a disguise and handing a bank teller a note demanding the unconditional surrender of money to which he has no conceivable claim"[9] does not blur the distinction between robbery in the first degree and theft in the first degree. See Farnsworth, 184 Wn. App. at 314.

The authority to define a criminal offense rests squarely with the legislature. State v. Villanueva-Gonzalez, 180 Wn.2d 975, 980, 329 P.3d 78 (2014). The legislature defines the crime of theft in the first degree as the taking of property "from the person of another." RCW 9A.56.030(1)(b). By contrast, the legislature defines robbery in the first degree when a person "commits a robbery within and against a financial institution," RCW 9A.56.200(1)(b), "by the use or threatened use of immediate force, violence, or fear of injury," RCW 9A.56.190. The plain language of the statute defining robbery shows the legislature was concerned with the risks that the threat to use force, violence,

---

[9] Farnsworth, 184 Wn. App. at 314-15 (Worswick, J., dissenting).

and injury entail and the nature of the defendant's conduct. State v. Tvedt, 153 Wn.2d 705, 712, 107 P.3d 728 (2005).

Clark also asserts insufficient evidence supports finding that he knew Reynolds planned to rob the banks. To convict Clark as an accomplice, the State had the burden of proving beyond a reasonable doubt that Clark actually knew he was promoting or facilitating the commission of the attempted robbery in the first degree at the Union Bank and the robbery in the first degree at the Banner Bank. RCW 9A.08.020(3)(a)(ii).[10] An accomplice must have actual knowledge that the principal was engaged in the charged crime. State v. Allen, 182 Wn.2d 364, 374, 341 P.3d 268 (2015). The statute provides that a person has actual knowledge when "he or she has information which would lead a reasonable person in the same situation to believe" he was promoting or facilitating the crime. RCW 9A.08.010(1)(b)(ii). However, "[w]hile the State must prove actual knowledge, it may do so through circumstantial evidence." Allen, 182 Wn.2d at 374.

Viewing the evidence in the light most favorable to the State, a rational jury could find beyond a reasonable doubt that Clark knowingly aided or facilitated the attempted robbery at the Union Bank and the robbery of the Banner Bank by acting as the getaway driver and that he and Reynolds were in communication with each other during the commission of the crimes.

There is no dispute that Clark drove Reynolds to the bank in Kirkland and the Banner Bank in Bellevue. Although parking spaces were available, Clark parked down the street from the first bank with the engine running. After leaving the Union Bank,

---

[10] RCW 9A.08.020(3)(a)(ii) states an individual is guilty as an accomplice if "[w]ith knowledge that it will promote or facilitate the commission of the crime," the individual "[a]ids or agrees to aid such other person in planning or committing it."

Reynolds ran in a "full blown run" to the car wearing black clothing, gloves, sunglasses, and carrying a bag when he got into the car. Clark drove off with the "tires squealing." When Clark arrived at the Banner Bank at 5:58 p.m. right before the bank closed, Clark did not park in the available spaces near the bank. Instead, Clark parked down the street while Reynolds went into the bank dressed in black clothing with the black beanie pulled down over his forehead, wearing black gloves, and carrying a black bag.

The undisputed evidence established that Reynolds used a Bluetooth device connected to a cell phone during the attempted robbery and robbery, and that Clark was in the car with his cell phone. During one of the recorded jail calls, Clark tells Matias that Reynolds "just got out of . . . prison. He never . . . used a phone before," so Clark "was showing him all the different kind of things he can do" on the phone. The evidence also showed Clark and Reynolds used a police scanner application that was "making noise in the car" while Reynolds went into the Union Bank and the Banner Bank. During the jail call, Clark tells Matias that the police scanner application "don't even matter" because "it's three minutes behind." But Clark admits the phone records "don't clear me."

The phone records showed the cell phone Reynolds stole from the T-mobile store and the cell phone registered to Clark were in the same location as the Union Bank in Kirkland during the attempted robbery and in the same location as the Banner Bank in Bellevue during the robbery. A forensic expert testified that the cell phone Reynolds was using and the cell phone in the getaway car communicated at the exact time of the attempted robbery in Kirkland and the robbery at the Banner Bank in

Bellevue. The phone records also showed that when Matias called Clark's phone during the attempted robbery and robbery, the calls went to voicemail.

Sufficient evidence supports the jury finding Clark guilty as an accomplice to attempted robbery and robbery in the first degree.

Because the remainder of this opinion has no precedential value, the panel has determined it should not be published in accordance with RCW 2.06.040.

Prior Convictions Jury Instruction

Clark does not challenge admission of his prior convictions. Clark contends the court abused its discretion by identifying the crimes of dishonesty in the jury instruction. For the first time on appeal, Clark also argues the court erred in failing to instruct the jury on evidence of other prior convictions. The State asserts that because Clark did not object to identifying the crimes of dishonesty and did not propose an instruction on other prior convictions, he has waived his right to challenge the jury instructions. The record supports the State's argument. The record shows Clark withdrew his objection to the jury instruction on the admission of the prior convictions for dishonesty, the court instructed the jury on evidence of other convictions, and the defense did not propose an alternative jury instruction.

During the hearing on motions in limine, the defense conceded that if Clark testified, his prior convictions for crimes of dishonesty were "per se" admissible.

During his testimony, Clark said he was in the Snohomish County Jail on a probation violation related to a previous drug charge.

> I'm on probation for selling drugs, and I went to prison for selling drugs
> and I got out and I went through a work release facility for five months and
> I worked. And then I got released to my then girlfriend now wife's house in
> Gold Bar.

28

Before cross-examination, the prosecutor argued that based on Clark's

testimony, in addition to convictions for crimes of dishonesty, the State was entitled to

impeach Clark with four other prior convictions.

> THE COURT: On the — so what crime? You want to
> get in the other crimes he was in custody for?
> [PROSECUTOR]: Well, he had four crimes. One was an
> assault III. One was unlawful possession of firearm in the second degree.
> One was a possession of stolen property in the second degree, and the
> other was the possession with intent, the VUCSA.[11]

The court ruled:

> It's all come in at this point, and I don't think it's just — it's there. You may
> bring it in. He's not — he's not contesting the fact that he's had a long
> history of criminal offenses. He's just saying he didn't do this one.

Defense counsel did not object, "[a]s long as the State doesn't argue propensity at the

end of it." The court ruled, "They may not argue propensity that he is a career criminal,

and obviously you got to convict him for that, but you may get into his other offenses."

At the conclusion of trial, the State proposed a jury instruction on the evidence of

prior convictions for crimes of dishonesty. The instruction specifically identifies the prior

convictions. The defense objected. "Your Honor, I would propose that the crimes not

be specifically listed but just generally crimes of dishonesty. I think that's less prejudice,

prejudicial than listing and ringing a bell."

The court ruled, "[T]he problem is there are a lot of crimes have come in. Some

crimes have come in for one purpose, some crimes have come in for other purposes.

[The jury] can certainly consider the fact that he was . . . at Snohomish County Jail." In

response, defense counsel stated, "That's fine."

---

[11] Violation of the Uniform Controlled Substances Act, chapter 69.50 RCW.

The jury instruction on the prior convictions for dishonesty states:

> You may consider evidence that the defendant has been convicted of Forgery, Possession of Stolen Property in Second Degree and Theft in the Third Degree only in deciding what weight or credibility to give to the defendant's testimony, and for no other purpose.

The jury instruction on evidence of other convictions states:

> You may consider evidence that a witness has been convicted of a crime only in deciding what weight or credibility to give to the testimony of the witness, and for no other purpose.

When prior conviction evidence is admitted under ER 609, the jury should be instructed that the conviction is admissible only on the issue of witness credibility and may not be considered on the issue of guilt. State v. Brown, 113 Wn.2d 520, 529, 782 P.2d 1013, 787 P.2d 906 (1989). However, if the defense fails to ask for a limiting instruction, any argument on appeal that the trial court should have given an instruction is waived. CrR 6.15; State v. Athan, 160 Wn.2d 354, 383, 158 P.3d 27 (2007); State v. Stein, 140 Wn. App. 43, 70, 165 P.3d 16 (2007) (refusing to consider an argument that a trial court should have given an unrequested limiting instruction on the use of admitted ER 404(b) evidence), review denied, 163 Wn.2d 1045, 187 P.3d 271 (2008).

Because Clark withdrew his objection to the instruction on evidence of prior crimes of dishonesty and did not request a different instruction on evidence of other convictions, he has waived his right to challenge the jury instructions on appeal.

However, we note that the prosecutor and defense counsel in closing argument effectively addressed the use of prior convictions. The prosecutor stated, in pertinent part:

> Regarding the convictions, it is true that you should not judge someone based on the fact that they have felony convictions, and you're given an instruction on that. But there's also a specific instruction given

that you can consider crimes of dishonesty, and specifically you can consider Mr. Clark's convictions for possession of stolen property, for theft, and for forgery, and you can consider those in assessing his credibility on the stand and just assessing his credibility in general.

Defense counsel stated, in pertinent part:

[Jury Instruction] Number 6 says, you may consider the evidence that the defendant has been convicted of a crime only in deciding the weight of credibility. . . . Your job is to weigh the facts of this case aside from the idea of propensity, aside from the idea of if he did it before, he probably did it again. That's improper. You can consider that history as is he telling me the truth now because he's getting convicted of a crime of dishonesty, but that's a different issue than saying, once a criminal, always a criminal. We don't do that in this world, not in this society, not in this courthouse.

## Closing Argument

Clark contends the prosecutor improperly commented on his demeanor during closing argument.

The court instructed the jury on the factors to consider in assessing credibility.

Jury instruction 1 states, in pertinent part:

You are the sole judges of the credibility of each witness. You are also the sole judges of the value or weight to be given to the testimony of each witness. In considering a witness's testimony, you may consider these things: the opportunity of the witness to observe or know the things he or she testifies about; the ability of the witness to observe accurately; the quality of a witness's memory while testifying; the manner of the witness while testifying; any personal interest that the witness might have in the outcome or the issues; any bias or prejudice that the witness may have shown; the reasonableness of the witness's statements in the context of all of the other evidence; and any other factors that affect your evaluation or belief of a witness or your evaluation of his or her testimony.

During closing argument, the prosecutor addressed Clark's "tears."

One doubt you may have is were Mr. Clark's tears genuine? Maybe they were. It can be an emotional experience to face the consequences of your actions and your choices, to think and feel the futility of trying to explain away every damning piece of evidence. You can imagine how frustrating, oppressive and even sad that can be. And maybe in his mind, since this happened, Mr. Clark has convinced himself

31

that he's not as guilty as John Reynolds; after all, Clark didn't enter the bank, Mr. Clark loaned the money to Reynolds, and this is the way he is repaid. Reynolds ratted him down and then Reynolds did a horrible job on the stand trying to lie for Clark. And that can be upsetting too.

The cynical side of you may say, you know, this is all just a con job to garner sympathy, that like the repeated references to him being a dad or a husband, that this is all just a con artist, to make him look sensitive, damaged, or wronged. We all know that tears don't necessarily mean that someone's telling the truth.

The court overruled the defense objection.

[DEFENSE COUNSEL]: I'm going to object to the characterization, your Honor. This I think we're very close to being improper on the closing.

THE COURT: Overruled. He can speak to the issue of demeanor, which is what he's doing.

[PROSECUTOR]: But don't think for a minute that the tears means that he's not guilty. If those tears are genuine, they're tears for no one but himself.

During a recess before rebuttal argument, the parties addressed the argument

and disagreed about whether Clark cried during his testimony.

[PROSECUTOR]: I just wanted to put on the record that the State made a comment in closing regarding defendant's tears, and I wanted to make sure that the record reflected that that comment was related to [Clark's] demeanor on the stand and how he was acting on the stand. It would be improper to comment on how the defendant was reacting to testimony, but there was no record of him crying on the stand, so I just wanted to make sure that I make my record now.

[DEFENSE COUNSEL]: Your Honor, and I will just say that there were tears while he was sitting here [at counsel table], and I don't think it was clear to the jury at all about which he was referring to, but counsel can make his record.

The court ruled it was apparent Clark cried while testifying.

Well, let me suggest, counsel, I was here and it was very apparent to me, as it would have been to the jury, that while he was on the witness stand he was seemingly emotional and that there were ample tears. I did not observe the same kind of demeanor sitting at counsel table. So I think that the impression I got from closing argument was that he was speaking directly about the defendant's demeanor while he was on the witness stand, and that's the reason I didn't sustain the objection.

32

What the jury instruction allows them to consider is the demeanor of the witness while testifying, and [the prosecutor] was commenting on [Clark's] demeanor while testifying.

In rebuttal, the prosecutor emphasized that a jury verdict must be based on the evidence and the jury may assess the demeanor of a witness in determining credibility.

[D]efense had asked you to assess Mr. Clark's credibility, and that's important too. When you look and listen to somebody that you're going to assess their demeanor and see whether they're credible. But that's not all we look at to see whether somebody's credible. That can actually be incredibly dangerous. You all know from your common experience, somebody can look at you right in the eye and tell you something and they're lying. So what do you look at? You don't just assess how they sound or how they look. You look at to whether it makes any sense, and that's why you don't just look at what Mr. Clark says or what Mr. Reynolds says, but you look at the big picture, the big picture that we presented to you, and that big picture is all of this evidence here, and all of that testimony, and all of the phone records that you heard and that you saw.

The trial court is in a much better position than the appellate court to rule on the question of whether Clark cried during his testimony. The court did not abuse its discretion in ruling the prosecutor did not improperly comment on Clark's demeanor by referring to his "tears" while testifying. In determining credibility, the jury instruction states the jury is entitled to consider "the manner of the witness while testifying." A prosecutor has wide latitude to argue reasonable inferences from the evidence including the credibility of a witness. State v. Thorgerson, 172 Wn.2d 438, 448, 258 P.3d 43 (2011). Where a defendant takes the stand, he necessarily puts his credibility at issue. Thorgerson, 172 Wn.2d at 448. The jury instruction allowed the prosecutor to argue that the jury should consider Clark's demeanor while testifying, including his "tears." See State v. Barry, 183 Wn.2d 297, 305, 352 P.3d 161 (2015) ("Courts have determined that consideration of demeanor evidence is constitutionally barred only if . . . it is merely the demeanor accompanying a defendant's silence or failure to testify.").

Statement of Additional Grounds

Clark contends the court committed reversible error by playing the redacted jail telephone calls for the jury during the deliberations. Where, as here, the recording is properly admitted into evidence as an exhibit, the court does not err in allowing the jury to listen to the recording during deliberations. State v. Gregory, 158 Wn.2d 759, 847-48, 147 P.3d 1201 (2006).

Clark also contends the court erred in allowing the prosecutor to refer to his "gang moniker" and admitting the portion of his statement where he said, "I'm a gangster . . . . I'm tattooed all the way from my head to my toe. I've been a gangster my whole . . . life." But the record shows the name "Lobo" was characterized as a "nickname" he used in connection with his cell phone and he did not object to the statement about being a "gangster" because it was relevant to explain why he did not stop and attempted to elude the police.

We affirm.

WE CONCUR: