FILED
SUPREME COURT
STATE OF WASHINGTON
4/17/2025
BY SARAH R. PENDLETON
CLERK

# OFFICE OF REPORTER OF DECISIONS
## SUPREME COURT OF WASHINGTON

Temple of Justice
P.O. Box 40929                                    (360) 357-2087
Olympia, WA  98504-0929               reporter.decisions@courts.wa.gov

**M E M O R A N D U M**

DATE:        April 17, 2025

TO:          Office of Supreme Court Clerk

FROM:        Sam Thompson, Reporter of Decisions

SUBJECT:     Change to *State v. Zghair*, No. 102787-7 (Wash. April 17, 2025), Dissenting Opinion of Montoya-Lewis, J.

The following change is made to the slip dissenting opinion cited above:

On page 13, in line 6 from the bottom of the page, after "where the evidence was" delete "sufficient" and insert "insufficient".

Please add this memorandum to the case file and notify the parties.

My office will notify LexisNexis and Thomson Reuters (Westlaw) to incorporate the change.

Thank you for your assistance.


c: Montoya-Lewis, J.

**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
APRIL 17, 2025

CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
APRIL 17, 2025

SARAH R. PENDLETON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 102787-7 |
| Petitioner, | |
| v. | En Banc |
| ABBAS SALAH ZGHAIR, | |
| Respondent. | Filed: <u>April 17, 2025</u> |

WHITENER, J. —Abbas Salah Zghair was convicted by a jury for the crime of felony murder in the second degree while committing assault in the second degree with a firearm enhancement. The primary question in this case is whether the evidence was sufficient to support Zghair's conviction. We hold that it was, and reverse the Court of Appeals.

FACTS AND PROCEDURAL HISTORY

I.      Factual Background

A.  The Events Preceding Silvano Ruiz-Perez's[1] Fatal Shooting

Silvano Ruiz-Perez's body was found by a passerby in an unattended field in Auburn, Washington, on March 24, 2019. 20 Recorded Rep. of Proc. (RP) at 1114-

---

[1] Silvano Ruiz-Perez's last name was spelled without hyphenation in the Court of Appeals' decision. The trial record and parties refer to Ruiz-Perez with a hyphen; as such, this opinion uses the hyphenated version of Ruiz-Perez's last name throughout this opinion.

17. The medical examiner found pellets in a wound located on Ruiz-Perez's left forearm, indicating that he was shot with bird shot designed for use in a shotgun. 25 RP at 1919-31. The medical examiner estimated that the shotgun was likely fired from a close distance, within three feet of Ruiz-Perez. *Id*. at 1929. The police found footprints, a blood trail, tire tracks, and a broken necklace that likely belonged to Ruiz-Perez at the scene. 21 RP at 1295-1301; 22 RP at 1335. The shotgun was never recovered. 21 RP at 1267; 23 RP at 1518; 27 RP at 2068.

Additional evidence included law enforcement use of a combination of cell site location tracking data, traffic camera footage, and video surveillance footage to illustrate the series of events leading up to Ruiz-Perez's fatal shooting.

On the evening of March 22, 2019, Ruiz-Perez was out drinking and eating at a restaurant he often frequented in Kent, Washington. 22 RP at 1345-61. He appeared on the restaurant's surveillance video from about 7:01 p.m. to 10:47 p.m. *Id.*

Early the next morning, at around 1:25 a.m., video surveillance from a Bank of America shows Ruiz-Perez exiting the rear of a white sedan and then withdrawing money from the bank's ATM (automated teller machine). Ex. 74, at 2-7; 27 RP at 2118-19. The bank confirmed that Ruiz-Perez had an account with them and that a

transaction occurred around 1:20 a.m. 27 RP at 2118-19. The video surveillance footage shows Ruiz-Perez using the bank's ATM and walking back toward the white sedan. Ex. 74, at 4-11; 27 RP at 2118-19.

Next, between 2:00 a.m. and 2:41 a.m., Ruiz-Perez made a number of phone calls to his fiancée, a coworker, and a taxicab company, looking for a ride. 27 RP at 2087-88. Shortly thereafter, at around 3:25 a.m., video surveillance from a Chevron gas station shows a white Pontiac sedan arrive, then two men exit the car, walk around the station, and reenter the car before driving away. 26 RP at 1956-59; 27 RP at 2108-10. One of the two men in the video was identified at trial as Abbas Zghair and the other as an unknown individual who was wearing a red jacket. 25 RP at 1856, 1873; 27 RP at 2110. Although Ruiz-Perez was not featured in the surveillance video, his cell phone location record indicated that he was also at the gas station at the same time. 26 RP at 1957-59; 27 RP at 2105-11.

Cell site location data showed Ruiz-Perez's and Zghair's cell phones accessed similar cell phone towers from 3:00 a.m. to 9:30 a.m. at the time of the Ruiz-Perez's shooting. 30 RP at 2423-47. Google geofence warrants were obtained for the Chevron gas station from 3:00 a.m. until 4:00 a.m., the homicide scene from 3:45 a.m. until 4:45 a.m., and the Chevron gas station again from 8:50 a.m. until 9:50 a.m.

The evidence did not reveal any cell phones other than Zghair's and Ruiz-Perez's cell phones during the stated times. *Id.*

Traffic camera footage at 4:08 a.m. captured images of the same white sedan driving toward the field where Ruiz-Perez's body was found and exiting the same field at 4:16 a.m. 27 RP at 2095-2104; 30 RP at 2436-37. The traffic camera footage shows some red through the windshield, indicating that the man in the red jacket may have been in the car when it drove away from the field. Ex. 68, at 57; Ex. 69. Cell site location data placed Ruiz-Perez's and Zghair's phones together at the field at around 4:00 a.m. 30 RP at 2451, 2433-34.

There were no witnesses who directly observed Ruiz-Perez's death. An unhoused couple living in their car parked nearby the unattended field testified about their observations from that night. 22 RP at 1436-39, 1459. The wife, Maryanne Denton, testified she was watching TV on her phone in her car, when she heard the sound of two gunshots, followed by the sound of two people arguing in what she believed was Spanish. 22 RP at 1440-45, 1464; 27 RP at 2149. She looked out the window and saw a bright car headlight, which obstructed her from seeing the color or type of car. 22 RP at 1445. The husband, Mark Denton, testified that although he did not hear the sound of gunshots, he did recall hearing two voices arguing in a language he could not understand and seeing a bright car headlight. *Id*. at 1476-78.

The State produced no evidence that Zghair and Ruiz-Perez had any prior contact before the night of Ruiz-Perez's death. It remains unclear why Ruiz-Perez was in Zghair's car that night, why Zghair was driving him around, or who the unknown man in the red jacket was in the video. Zghair, during an interview with detectives, stated that he did not know Ruiz-Perez and that he had picked up a "Mexican guy" at a gas station and went to a Bank of America for the person to withdraw $100. 28 RP at 2222-23. Zghair said that the person needed "coke" and would pay Zghair the $100 for gas money to drive him "out on the hill." *Id.* at 2226-28.

## B. The Events Following Silvano Ruiz-Perez's Fatal Shooting

The police eventually located the white Pontiac sedan, and forensic evidence connected the car to the crime scene. On April 9, 2019, more than two weeks after Ruiz-Perez's death, an officer located the white Pontiac sedan while on patrol in Covington, Washington. 22 RP at 1392, 1394-97; 27 RP at 2114, 2117. The car was registered to Abbas Zghair; it had food stains and it contained various items, such as clothing, a soda can, a toothbrush, documents with Zghair's name on it, and Zghair's car registration form. 22 RP at 1429; 23 RP at 1651-54, 1657-58, 1662. A distinctive sticker had been removed from the front windshield and the license plate had been moved from the windshield to its proper placement on the front of the car. 27 RP at

2126; Ex. 68; Ex. 73. An FBI search of the car revealed small amounts of blood in the car's seat cushion, which matched Ruiz-Perez's blood. Also found on the seat cushion was bird shot. 27 RP at 2167-68. The car smelled heavily of cologne. 23 RP at 1636. During an interview with detectives, Zghair admitted owning the car. Ex. 76, at 5.

Around April 9, 2019, Zghair pawned his cell phone. Ex. 76, at 24-25; 28 RP at 2266-69. Zghair explained during his police interview that he sold his phone for money. Ex. 76, at 24-25. His cell phone service had been terminated after he had quit working for his former employer. 24 RP at 1786.

On April 12, 2019, the police conducted a search of Zghair's last known residence. At the time, Zghair was living between locations and was essentially unhoused. 23 RP at 1504-18; 24 RP at 1775; 27 RP at 2139. On April 13, 2019, Zghair joined two friends on a trip to Canada. 28 RP at 2354. At the Sumas border crossing, Zghair and his friends were denied group entry for failing to bring federally issued identification documentation. 23 RP at 1551-55; 28 RP at 2345-46. While returning through the U.S. border station, Zghair presented a friend's driver's license as his own. 23 RP at 1552-56. The group was denied entry into Canada and they were held for further processing. 23 RP at 1557-74, 1585-86; 28 RP at 2347-50. Zghair went to a nearby gas station while awaiting processing. 28 RP at 2348. Border

control officials began looking for him, and once Zghair realized they were looking for him, he ran but was quickly apprehended. 23 RP at 1572-73, 1585-86.

Detectives from the Auburn Police Department were notified that Zghair was detained at the Sumas border. 23 RP at 1590; 27 RP at 2183-85. Zghair was transported to Whatcom County Jail where he was interviewed by Auburn Detectives Arneson and Walker. 27 RP at 2184-85. Zghair was given *Miranda*[2] warnings, and during his interview, Zghair made a number of statements that were admitted at trial. Zghair acknowledged owning the white Pontiac. Ex. 76, at 5. Detective Walker told Zghair that his car had been used in the commission of a murder. Zghair denied involvement and, unsolicited, said, "I don't know how to use [a] gun" and stated that he had picked up a "Mexican guy" to go to a Bank of America to withdraw $100. Ex. 76, at 17; 28 RP at 2222-23. Zghair said that the person needed "coke" and would pay Zghair the $100 for gas money to drive him "out on the hill." 28 RP at 2227. Detective Walker had not disclosed that a gun was involved in the commission of the murder or that the murder victim was of Hispanic background.

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

C. Procedural History

The jury, at the close of evidence, was charged with determining whether Zghair or an accomplice committed assault in the second degree and caused the death of Ruiz-Perez in furtherance of that crime. Clerk's Papers (CP) at 121. The jury was instructed that an "intentional shooting of another person" amounts to second degree assault and was instructed on liability both as a principal and as an accomplice. CP at 123, 122, 130.

The jury inquired during deliberations about instruction numbers 11 and 14. They asked, "1) Regarding instruction #11, is an action of intent limited to actions leading up to the commitment of a crime? Or can aid be implied by actions occur[r]ing after a crime?" and "2) Regarding instruction #14, does the withholding of information to detectives constitute aiding another person in planning or committing a crime?" CP at 135. The court responded by asking the jury to refer to the court's entire instructions as given. CP at 136. Neither party objected to the trial court's jury instructions or its answers to the jury's questions.

The jury returned a general verdict of guilty of the crime of murder in the second degree while committing an assault and affirmatively answered a special verdict asking if Zghair was armed with a firearm at the time of the crime. CP at

137. The trial court sentenced Zghair to a term of 192 months plus the 60-month mandatory firearm enhancement, for a total of 252 months. CP at 146-50. Zghair timely appealed. CP at 156.

On direct appeal, Zghair argued, among other things, that insufficient evidence supported his conviction for assault in the second degree because the State failed to prove that he acted as a principal or an accomplice. The Court of Appeals reversed Zghair's conviction for second degree murder while committing second degree assault with a firearm enhancement. The court concluded that the evidence did not support Zghair's conviction as a principal or an accomplice.

ISSUE

Was there sufficient evidence to support Zghair's second degree felony murder conviction predicated on second degree assault?

ANALYSIS

I.   The Standard of Review

   A.   The Sufficiency of the Evidence

"'[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" *State v. Hummel*, 196 Wn. App. 329, 352, 383 P.3d 592

9

(2016) (alteration in original) (quoting *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)); U.S. CONST. amend. XIV; WASH. CONST. art. I, § 3). Thus, "[t]he sufficiency of the evidence is a question of constitutional law that [this court] review[s] de novo." *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016).

To determine if sufficient evidence supports a conviction, we consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *see also State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (plurality opinion). The trier of fact resolves conflicts in the testimony, weighs the evidence, and draws reasonable inferences from basic facts to ultimate facts. "[T]he factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." *Jackson*, 443 U.S. at 319; *see also State v. Homan*, 181 Wn.2d 102, 106, 330 P.3d 182 (2014). This inquiry "does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Jackson*, 443 U.S. at 318-19. As the reviewing court, we must not "reweigh the evidence and substitute our judgment

for that of the jury." *State v. Notaro*, 161 Wn. App. 654, 671, 255 P.3d 774 (2011) (citing *Green*, 94 Wn.2d at 221). We "impinge[] upon a jury's discretion only to the extent necessary to protect the constitutional standard of reasonable doubt." *Green*, 94 Wn.2d at 221.

### B. Circumstantial Evidence

"A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial and direct evidence are to be considered equally reliable, and credibility determinations are not subject to review. *State v. Cardenas-Flores*, 189 Wn.2d 243, 266, 401 P.3d 19 (2017) (citing *State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004)). "In determining the sufficiency of the evidence, circumstantial evidence is not to be considered any less reliable than direct evidence." *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). "[I]nferences based on circumstantial evidence must be reasonable and cannot be based on speculation." *State v. Vasquez*, 178 Wn.2d 1, 16, 309 P.3d 318 (2013).

### C. Accomplice Liability

Washington's complicity statute requires the State to prove the putative accomplice had actual knowledge that his or her conduct would promote or facilitate

the crime for which he or she is eventually charged. RCW 9A.08.020(3). Under Washington's complicity statute, a person is guilty as an accomplice of another person in the commission of the crime if, with knowledge that it will promote or facilitate the crime he or she "(i) [s]olicits, commands, encourages, or requests such other person to commit [the crime]; or (ii) [a]ids or agrees to aid such other person in planning or committing [the crime]." *Id*.

To be an accomplice, an individual must have acted with knowledge that they were promoting or facilitating *the* crime for which they were eventually charged, not merely the knowledge that the principal intended to commit *a* crime. *State v. Cronin*, 142 Wn.2d 568, 579, 14 P.3d 752 (2000). The State must prove actual knowledge and it may do so through circumstantial evidence. Thus, Washington's culpability statute provides that a person has actual knowledge if "[h]e or she has information which would lead a reasonable person in the same situation to believe" that he or she was promoting or facilitating the crime eventually charged. RCW 9A.08.010(1)(b)(ii); *State v. Allen*, 182 Wn.2d 364, 374, 341 P.3d 268 (2015). "[T]he jury must find actual knowledge but may make such a finding with circumstantial evidence." *Allen*, 182 Wn.2d at 374 (explaining the "critical" distinction between a jury permissibly finding actual knowledge through circumstantial evidence and impermissibly finding a defendant constructively

12

"should have known" (citing *State v. Shipp*, 93 Wn.2d 510, 514-16, 610 P.2d 1322 (1980))). Nothing forbids a jury from logically inferring mens rea from proven facts, so long as it is satisfied the State has proved mens rea beyond a reasonable doubt. *State v. Bencivenga*, 137 Wn.2d 703, 709, 974 P.2d 832 (1999). An actor's mental state may be inferred from circumstantial evidence, including that a defendant intends the natural and probable consequences of his acts. *State v. Bea*, 162 Wn. App. 570, 579, 254 P.3d 948 (2011). Therefore, the jury must find that Zghair had actual knowledge of "the crime" to be committed, and the jury may infer actual knowledge based on circumstantial evidence that a reasonable person in Zghair's situation would have believed he or she was promoting or facilitating the crime eventually charged. *State v. Roberts*, 142 Wn.2d 471, 510, 14 P.3d 713 (2000); *Cronin*, 142 Wn.2d at 579.

"This court has repeatedly stated that one's presence at the commission of a crime, even coupled with a knowledge that one's presence would aid in the commission of the crime, will not subject an accused to accomplice liability." *State v. Rotunno*, 95 Wn.2d 931, 933, 631 P.2d 951 (1981). To prove accomplice liability, the State must prove that Zghair was "'ready to assist'" in the commission of the crime. *Id*. (internal quotation marks omitted) (quoting *In re Welfare of Wilson*, 91 Wn.2d 487, 491, 588 P.2d 1161 (1979)).

13

II.     The Totality of the Circumstantial Evidence Supports Zghair's Conviction

Zghair contends that the evidence was insufficient to support his conviction, arguing that the evidence only established his mere presence at the scene and his knowledge that the crime occurred after the fact. We disagree. To convict Zghair on a theory of accomplice liability for second degree felony murder, predicated on second degree assault, the State must prove the crime was committed and the accused acted with knowledge that he was aiding in the commission of the offense. RCW 9A.08.020(3)(a)(ii). Taking the evidence and all inferences in the light most favorable to the State, the circumstantial evidence here is sufficient to allow the rational trier of fact to conclude that Zghair was the principal or accomplice for the charged crime.

The jury was instructed that it should find Zghair guilty if the State proved beyond a reasonable doubt that Zghair committed the assault either as a principal or as an accomplice. CP at 120, 122, 127-28. The jury was instructed on liability as a principal and an accomplice. The jury was instructed that an "intentional shooting of another person" amounted to the crime of second degree assault. CP at 123. There were no objections to the jury instructions. "'Jury instructions not objected to become the law of the case.'" *State v. Dreewes*, 192 Wn.2d 812, 821, 432 P.3d 795 (2019) (quoting *State v. Hickman*, 135 Wn.2d 97, 102, 954 P.2d 900 (1998)).

Taken in the light most favorable to the State, the evidence shows that (1) a combination of cell site location data, traffic camera footage, and video surveillance footage placed Zghair and Ruiz-Perez together throughout the night of Ruiz-Perez's fatal shooting, (2) Zghair drove Ruiz-Perez around in his car on the night of the shooting, (3) Zghair drove Ruiz-Perez to an unattended field where Ruiz-Perez was fatally shot and left to die, (4) Zghair drove away from the scene soon after Ruiz-Perez was shot, (5) Ruiz-Perez was killed with a shotgun, (6) the medical examiner report shows that Ruiz-Perez was shot while standing next to or while inside Zghair's car, (7) forensic evidence shows that Ruiz-Perez's blood and traces of bird shot from a shotgun were found in the back seat cushion of Zghair's car, (8) the pellets found in Ruiz-Perez's wound indicate he was shot with a shotgun, (9) testimony from nearby witnesses indicated there were the sounds of gunshots and a verbal argument coming from the unattended field, (10) Zghair admitted to owning the car used to transport Ruiz-Perez around on the night of his death and having knowledge of his fatal shooting, and (11) before told by police, Zghair admitted to knowing a gun was used in the commission of a murder and knowledge that the victim's perceived ethnicity was someone of Mexican origin.

We start with the principle that actual knowledge to establish accomplice liability can be inferred from all the facts and circumstances. *Bencivenga*, 137 Wn.2d

15

at 708-709; *see also Allen*, 182 Wn.2d at 374. There are hypothetically rational alternative conclusions that the jury could have drawn from the proven facts, however the fact finder is not barred against discarding one possible inference when it concludes such inference unreasonable under the circumstances. *Bencivenga*, 137 Wn.2d at 708-09. Appellate courts cannot appropriate the role of factually determining the reasonableness of an inference. *Id.* at 708. For instance, there was traffic camera video footage and video surveillance footage suggesting that the unidentified individual in the red jacket was present at the scene of the shooting. The jury may have alternatively found the traffic camera footage was insufficient to suggest the unidentified individual in red was present in Zghair's car when the car arrived and left the unattended field. Ex. 68, at 57; Ex. 69. The jury was free to infer either that Zghair aided this individual in carrying out the shooting as an accomplice or, in the alternative, that Zghair was the only other person present at the scene and therefore liable as a principal. It is the province of the finder of fact, not the appellate court, to determine what conclusions reasonably flow from the particular evidence in a case. *Bencivenga*, 137 Wn.2d at 707.

The totality of the circumstantial evidence shows that Zghair and Ruiz-Perez were together throughout the night of the shooting, that Zghair drove Ruiz-Perez around in his car with a shotgun, that Zghair took Ruiz-Perez to a secluded area

where Ruiz-Perez was fatally shot in the course of an altercation, and that Zghair drove away immediately thereafter. Viewing all the circumstantial evidence in the light most favorable to the State, a rational trier of fact could find beyond a reasonable doubt that Zghair knowingly promoted or facilitated an intentional shooting of another person by aiding in the commission of the crime. In sum, we hold that the evidence was sufficient to support Zghair's conviction because a rational trier of fact could find that Zghair acted with knowledge that he was aiding or facilitating in the commission of the offense.

### A. Washington's Complicity Statute Does Not Require the State To Prove Actual Knowledge of a Plan

Contrary to the Court of Appeals' decision, Washington's complicity statute does not require the State to prove that the defendant had knowledge of a plan to commit the crime charged. It is a long-standing rule that the accomplice liability statute predicates liability on general knowledge of the crime and not specific knowledge of the elements of the crime. *Dreewes*, 192 Wn.2d at 823 (quoting *Roberts*, 142 Wn.2d at 510-13; *State v. Hoffman*, 116 Wn.2d 51, 104, 804 P.2d 577 (1991); *State v. Rice*, 102 Wn.2d 120, 125, 683 P.2d 199 (1984)). The Court of Appeals' decision however inaccurately concluded that accomplice liability demands proof that the putative accomplice had knowledge of a plan to commit the

crime charged. *State v. Zghair*, No. 83489-4-I, slip op. at 22 (Wash. Ct. App. Nov. 6, 2023) (unpublished), https://www.courts.wa.gov/opinions/pdf/834894.pdf. In particular, the decision states that to prove accomplice liability, the State must "establish that Zghair had knowledge of a plan to shoot Ruiz[-]Perez *before* the crime occurred." *Id*. at 18. The court also stated that "there is no evidence that Zghair or the person in the red jacket was the shooter or that Zghair was aware of any plan that any person was armed and prepared to shoot Ruiz[-]Perez." *Id*. at 17. Knowledge of a plan to commit the charged crime is not a required element to establish accomplice liability. Washington's complicity statute provides the State with multiple ways to establish liability under RCW 9A.08.020(3)(a)(ii), as is clear from the use of the disjunctive "or" twice in subsection (3)(a)(ii) of the statute. The State must prove the putative accomplice either aided *or* agreed to aid another in the planning *or* in the commission of the charged crime. RCW 9A.08.020(3)(a)(ii). Alternatively, if the State had chosen to establish accomplice liability under subsection (3)(a)(i), it would have needed to present evidence that Zghair solicited, commanded, encouraged, or requested another person to commit the charged crime. RCW 9A.08.020. Under subsection (3)(a)(i), the State is similarly not required to present evidence that Zghair had knowledge of a "plan" to commit the charged crime. Thus, evidence of a plan to commit the charged crime is not a requirement of

18

accomplice liability, it is simply one way the State may establish liability. *Id*. The State was permitted to establish accomplice liability by proving that Zghair aided another in committing the charged crime. The jury instructions accurately reflect the above legal standard. CP at 110-34.

### B. The Court of Appeals Erred in Reweighing the Evidence

The Court of Appeals impermissibly reweighed the evidence at numerous points in reaching its conclusion. The relevant inquiry is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Green*, 94 Wn.2d at 221 (citing *Jackson*, 443 U.S. at 319). The Court of Appeals' emphasis on the lack of direct evidence connecting Zghair to the shotgun mischaracterized the State's evidence as proving only that Zghair was merely present at the scene of the crime and had knowledge of the occurrence of the second degree assault. The court reasoned that because there was no eyewitness testimony connecting Zghair to a shotgun and no physical evidence of the shotgun, it was unreasonable to infer a connection between Zghair and the weapon. *Zghair*, slip op. at 10, 17, 2 (concluding that "no one saw [Zghair] with a shotgun," there was no evidence "Zghair was aware there was a shotgun in the Pontiac," "there was no physical evidence" of the shotgun or "evidence of the dimensions of the shotgun," and "[t]he police did not recover a

19

shotgun"). This approach ignored the circumstantial evidence that connects Zghair to the shotgun. A "'jury is permitted to infer from one fact the existence of another essential to guilt, if reason and experience support the inference.'" *Bencivenga*, 137 Wn.2d at 707 (internal quotation marks omitted) (quoting *State v. Jackson*, 112 Wn.2d 867, 875, 774 P.2d 1211 (1989)). Here, the medical examiner's report showed the pellets found in Ruiz-Perez's arm contained bird shot, a type of shotgun pellet, and the forensic report of Zghair's car showed traces of Ruiz-Perez's blood and bird shot pellets. The medical examiner also estimated that Ruiz-Perez was shot likely within three feet of the person, suggesting he was shot while either in Zghair's car or nearby it. Zghair also admitted to detectives that he knew a gun was used in the commission of the crime. Finally, there is the commonsense inference that shotguns are difficult to conceal, making it reasonable to infer that Zghair was aware of its existence in his car. The totality of the circumstances permitted the jury to infer that Zghair was present and ready to assist in the shooting by driving Ruiz-Perez to an unattended field where Ruiz-Perez was fatally shot with a weapon Zghair knew was in his car.

The Court of Appeals' decision also pointed to the absence of direct evidence that Zghair had a motive to shoot Ruiz-Perez. The decision states, "There was also no evidence that Zghair had a motive to shoot Ruiz-Perez" and that the "two were

'strangers' to one another who had never met before." *Zghair*, slip op. at 10. No crime requires the State to prove motive. Accomplice liability requires the State present proof of actual knowledge, which can be based on circumstantial evidence that a reasonable person in Zghair's situation would have believed he was promoting or facilitating the crime of second degree assault. *Roberts*, 142 Wn.2d at 510; *see also Cronin*, 142 Wn.2d at 579.

In addition, the Court of Appeals impermissibly reweighed the testimony from Maryanne Denton and Mark Denton, who testified to their observations on the night of Ruiz-Perez's shooting. The court discounted Ms. Denton's testimony because there was no evidence that Zghair spoke or understood Spanish and because Ms. Denton herself does not speak Spanish and recalled the sound of arguments only after hearing the sound of gunshots. This is error as an appellate court should not reweigh the evidence. Yet, the court discounted the circumstantial evidence indicating that Ruiz-Perez's shooting occurred in the course of an altercation. For example, there was evidence of a broken necklace belonging to Ruiz-Perez found at the scene and evidence of footprints and a blood trail indicating that Ruiz-Perez tried to run away from the shooter. It was for the jury to weigh the Dentons' credibility, any conflicting testimony, and the veracity of their memories.

In sum, the Court of Appeals erred when it reweighed the evidence. Circumstantial evidence is to be considered as equally reliable as direct evidence and credibility determinations are not subject to review by appellate courts.

C. There Is No Bar Against Using Evidence That Occurs After the Commission of the Crime To Establish Accomplice Liability

The Court of Appeals' decision relied in part on *Anderson*, 63 Wn. App. 257, 818 P.2d 40 (1991). It interpreted *State v. Anderson* to stand for the proposition that evidence that occurs after the commission of a crime cannot establish a putative accomplice's actual knowledge of his or her promotion or facilitation of that crime. *Zghair*, slip op. at 12-13. In *Anderson*, the court distinguished between the crime of rendering criminal assistance "after the fact" and the crime of knowingly aiding in the commission of the charged offense. 63 Wn. App. at 261 (citing RCW 9A.08.020). In *State v. Hanley*, the Court of Appeals also discussed this distinction between rendering criminal assistance and accomplice liability and specifically noted that Washington's complicity statute "employs verbs that describe actions preceding the crime, not conduct that helps the offender after he or she commits the crime." 33 Wn. App. 2d. 99, 107, 559 P.3d 559 (2024). In both cases, the courts concluded that that there was insufficient evidence to establish accomplice liability

as the evidence presented pointed only to the putative accomplice's aiding in the crime after the fact.

Accomplice liability demands evidence that allows for the trier of fact to assess the putative accomplice's knowledge before and during the commission of the crime. This does not bar the State from allowing the jury to consider evidence that occurs after the fact to establish accomplice liability. In most cases, as was the case in *Anderson* and *Hanley*, in order for the State to prevail, it must present evidence relating to the defendant's knowledge at the time of the commission of the crime. We cannot however discount a scenario where a putative accomplice's conduct or statements that occur after the commission of the crime may help establish that they had actual knowledge of their promotion or facilitation of the charged crime.

The issue in *Anderson* and *Hanley* is not present here. Here, the State presented evidence that occurred before and during the commission of the crime. The State also presented evidence that occurred after the crime. If the State were to rely solely on after-the-crime evidence to establish actual knowledge, then the outcome might have been different. That issue is not before us. There is sufficient circumstantial evidence to establish that Zghair had actual knowledge of his promotion and facilitation of the crime of second degree assault.

CONCLUSION

The totality of the circumstantial evidence in this case was sufficient to allow a rational trier of fact to determine that Zghair had actual knowledge that he was promoting or facilitating in the commission of the crime of second degree assault. The Court of Appeals is reversed, and Zghair's conviction is affirmed.

_____
Whitener, J.

WE CONCUR.

_____
Stephens, C.J.

_____
Johnson, J.

_____
Yu, J.

_____
Madsen, J.

_____
González, J.

_____
Sutton, J.P.T.

24

No. 102787-7

MONTOYA-LEWIS, J. (dissenting)—Sufficiency of the evidence "is a deferential standard, but it is not a rubber stamp." *In re Pers. Restraint of Knight*, 2 Wn.3d 345, 354, 538 P.3d 263 (2023) (plurality opinion). "The purpose of the sufficiency inquiry is to 'ensure that the trial court fact finder "rationally appl[ied]" the constitutional standard required by the due process clause of the Fourteenth Amendment, which allows for conviction of a criminal offense only upon proof beyond a reasonable doubt.'" *State v. Berg*, 181 Wn.2d 857, 867, 337 P.3d 310 (2014) (alteration in original) (quoting *State v. Rattana Keo Phuong*, 174 Wn. App. 494, 502, 299 P.3d 37 (2013) (quoting *Jackson v. Virginia*, 443 U.S. 307, 317-18, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979))). We reverse a conviction on the basis of insufficient evidence rarely, and for good reason, as we defer to the fact finder—in this case, the jury. But rare does not mean never. In this case, we should reverse Abbas Salah Zghair's conviction. In light of the majority's decision to uphold

1

Zghair's conviction, I question whether any case could be reversed on an insufficiency of the evidence claim.

Due process requires the State to prove every essential element of a crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 317-20; *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *State v. Byrd*, 125 Wn.2d 707, 713, 887 P.2d 396 (1995). Thus, when reviewing the sufficiency of the evidence, the test is whether the evidence and reasonable inferences from it, viewed in the light most favorable to the State, would permit a rational fact finder to conclude the State has carried its burden to prove every element beyond a reasonable doubt. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992); *State v. Finch*, 137 Wn.2d 792, 831, 975 P.2d 967 (1999) (plurality opinion); *Berg*, 181 Wn.2d at 867.

Here, the majority's application of this test has no teeth, upholding the second degree assault conviction when a third person may have been involved in the shooting and the scant evidence sheds little light on what the defendant knew or intended at the time of the crime. Specifically, to convict Zghair, the evidence must support a reasonable inference that Zghair either (a) committed an *intentional* assault as the shooter himself or (b) aided someone else's intentional assault *with the knowledge his assistance would facilitate that specific crime*.

The majority concludes the evidence supports every element of the charged crime but without truly questioning it at all. I agree that the sufficiency standard is a

2

deferential one, but deference requires some independent judicial inquiry beyond unquestioning capitulation to the State's version of events. *Knight*, 2 Wn.3d at 354. *Contra State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016) (sufficiency of the evidence is a question of constitutional law reviewing courts must consider de novo). Under the analysis conducted by the majority, the State will always find convictions sustained on the sufficiency of the evidence by simply gesturing to the totality of the circumstances, even if those circumstances leave gaps in proof of critical elements of the crime. While I agree that a conviction will rarely be overturned based on insufficient evidence, this case's gaps in proof meant the jury found guilt based not on reasonable inferences but on speculation. If this is not insufficient evidence, nothing is. In holding to the contrary, the court today effectively eliminates sufficiency of the evidence as a basis to overturn a conviction. *Contra Jackson*, 443 U.S. at 318-19 (due process requires the State to prove every element of a crime beyond a reasonable doubt); *Berg*, 181 Wn.2d at 867. Therefore, I must respectfully dissent.

## ANALYSIS

In this case, the State's theory was, and the jury was instructed, that Zghair may be guilty of second degree assault as either a principal or an accomplice. 1 Clerk's Papers (CP) at 120-22, 127-28; *see State v. Hickman*, 135 Wn.2d 97, 102, 954 P.2d 900 (1998) ("jury instructions not objected to become the law of the case").

A person commits second degree assault if they *intentionally* assault another person with a deadly weapon, such as a firearm. RCW 9A.36.021(c); RCW 9A.04.110(6); 1 CP at 122-25. Therefore, the evidence would be sufficient to convict Zghair as a principal if the jury could reasonably conclude *Zghair was the shooter* and he assaulted Silvano Ruiz-Perez *intentionally*. Alternatively, Zghair could be convicted if he acted as an accomplice to someone else who *intentionally* assaulted Ruiz-Perez. A person may be liable for the conduct of another as an accomplice in the commission of a crime if, "[w]ith *knowledge* that it will promote or facilitate the commission of *the crime*, [one]: (i) [s]olicits, commands, encourages, or requests such other person to commit it; or (ii) [a]ids or agrees to aid such other person in planning or committing it." RCW 9A.08.020(3)(a) (emphasis added); 1 CP at 127-29. In other words, the evidence would be sufficient to convict Zghair under this theory if it reasonably showed Zghair knew the shooter would commit an intentional assault and he aided or facilitated the commission of that specific crime.

Under either theory of liability the State presented, the State must prove the elements of both actus reus and mens rea—that is, not only that Zghair engaged in the specific conduct prohibited by the crime but also that he had the requisite mental state at the time of the criminal conduct. Intent may be inferred from circumstances that "'plainly indicate such an intent as a matter of logical probability,'" but not "'from evidence that is patently equivocal'" or "based on rank speculation." *State v.*

4

*Vasquez*, 178 Wn.2d 1, 8, 309 P.3d 318 (2013) (internal quotation marks omitted)

(quoting *State v. Woods*, 63 Wn. App. 588, 591-92, 821 P.2d 1235 (1991)); *id*. at 18;

*State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

I agree with much of the majority's characterization of the evidence presented at trial and the facts established by it. Taking the State's evidence as true and viewing reasonable inferences in its favor, a rational trier of fact could find that Ruiz-Perez was fatally shot near Zghair's car and that Zghair (1) drove Ruiz-Perez around on the night of the shooting, (2) was present when Ruiz-Perez was shot, (3) drove the car away from the scene without Ruiz-Perez, and (4) later admitted he knew someone had been shot. None of those facts provide any evidence on Zghair's mental state at the time of the crime. In order to decide that Zghair acted with intention, either as a principal or as an accomplice, the fact finder would have had to speculate or guess rather than infer from the evidence.

As the majority notes, the evidence indicates Zghair and Ruiz-Perez were not alone on the night of the shooting. Majority at 3-4. Security video and cell phone location records indicate Zghair and Ruiz-Perez were together from around 1:35 a.m. (when Ruiz-Perez exited a white sedan car to use an ATM) to 4:15 a.m. (after the shooting). Ex. 68, at 46-57; Ex. 69; Ex. 74, at 10-11; 27 Recorded Rep. of Proc. (RP) (Sept. 29, 2021) at 2095-2104, 2118-19. Less than an hour before the shooting (at 3:35 a.m.), another person appeared on security video, exiting a white sedan car with

Zghair—someone who appeared to be a man wearing a red jacket. Majority at 3; 25 RP (Sept. 27, 2021) at 1856, 1873; 27 RP (Sept. 29, 2019) at 2110; 28 RP (Sept. 30, 2019) at 2317, 2322-23, 2355; Ex. 70, at 5-7. Later, traffic camera footage captured Zghair's car driving away from the location of the shooting, showing some red through the windshield, indicating that the individual in red may have been in the car immediately after the shooting. Majority at 4; Ex. 68, at 57; Ex. 69. In fact, at trial, the State argued the individual in red was with Zghair and Ruiz-Perez throughout the shooting. *E.g.*, 31 RP (Oct. 7, 2021) at 2542-43 ("And what we see in the video is we can see what appears to be red. The defendant is necessarily at this point driving the killer away, whether it's him or whether it's the [individual] in red."). The State never presented any evidence identifying the individual in red; the third person present on the night of Ruiz-Perez's death remains unknown to this day.

A.     Liability as a Principal

The majority does not discuss whether the evidence was sufficient to convict Zghair as a principal, instead analyzing the sufficiency of the evidence only as to accomplice liability. As discussed below, I would hold that the evidence is not sufficient to establish Zghair knowingly aided an intentional assault. The State presented principal and accomplice liability as alternate theories at trial, and I would conclude the evidence was not sufficient to convict Zghair as a principal, either.

In support of the State's theory that Zghair intentionally shot Ruiz-Perez,

6

viewing the evidence in the light most favorable to the State, the evidence supports a reasonable inference that Zghair and Ruiz-Perez were together up to and during the shooting, which occurred very near Zghair's car. The car and both their cell phones were in the same vicinity late at night, eventually arriving at a field where Ruiz-Perez was shot, and blood and bird shot landed in the car's seat cushion. The "heated discussion" the Dentons overheard *after* the gunshots, as well as the broken necklace, also support an inference that there was some sort of disagreement or struggle.[1] 22 RP (Sept. 21, 2021) at 1464. This evidence is sufficient to show a harmful or offensive shooting of another person occurred. *E.g.*, 1 CP at 123.

But the State was required to prove Zghair *intentionally* assaulted Ruiz-Perez. *Id.* ("An assault is an *intentional* shooting of another person that is harmful or offensive." (emphasis added)). While the evidence of a shooting is strong, the evidence it was done *intentionally* is weak and speculative. *Vasquez*, 178 Wn.2d at 16 ("inferences based on circumstantial evidence must be reasonable and cannot be

---

[1] However, Maryanne Denton testified that she heard voices *after* she heard two gunshots, and neither Maryanne nor Mark Denton could understand what was said, as they believed the argument was in Spanish, a language neither of them spoke. 22 RP (Sept. 21, 2021) at 1440-45, 1464-68. While Ruiz-Perez spoke Spanish, there is no evidence Zghair spoke or understood that language. *Id.* at 1342; 25 RP (Sept. 27, 2021) at 1823, 1899. Courts reviewing the sufficiency of the evidence do not reweigh the evidence, but we do assess whether reasonable inferences can be drawn from it or only speculation. *Vasquez*, 178 Wn.2d at 16 (citing *Jackson*, 443 U.S. at 319). This evidence supports a reasonable inference that the shooting occurred in the context of a dispute, but to conclude more—that there was an intentional shooting—requires speculation. The jury would have to speculate when the gun appeared and who was holding it. The jury would have to speculate which person spoke, what they said, and whether the other could understand. And, given that the "heated discussion" occurred only after the gun was fired, this evidence makes an accidental shooting equally as likely as an intentional one.

7

based on speculation"). In closing argument, the State suggested the reason Ruiz-Perez was killed may have been to rob him of his phone. 31 RP (Oct. 7, 2021) at 2544. But intent to commit a robbery does not establish intent to commit the charged crime of second degree assault. The State also emphasizes the totality of the circumstances, such as the time of night, relatively remote location,[2] and Zghair's behavior after the fact. But driving around late at night should not be sufficient circumstantial evidence of intent to commit assault. Such behavior is far too equivocal—indeed, other evidence offered by the State suggests other possible reasons for Zghair and Ruiz-Perez to drive around together that night, such as Ruiz-Perez's need for a ride or plan to acquire drugs. Even viewing all the evidence in the light most favorable to the State, a rational trier of fact could not reasonably infer Zghair *intended* to assault Ruiz-Perez; instead, the jury could reach that conclusion only by speculation, which is insufficient evidence. *Vasquez*, 178 Wn.2d at 16, 18.

There is also the problem of the individual in red. I agree with the majority that given the evidence that suggests the individual in red was present at some points that night, the jury was free to infer either that the individual in red was present at the time of the shooting or, "in the alternative, that Zghair was the only other person

---

[2] The State describes the location of the shooting as "lonely field." *E.g.*, Suppl. Br. of Pet'r at 5. The majority describes it as an "unattended field." Majority at 14-15. But Mark Denton and police who responded to the scene testified that the field was across the street from businesses and many people resided nearby in apartments, cars, and encampments. 21 RP (Sept. 20, 2021) at 1189-94, 1249-53; 22 RP (Sept. 21, 2021) at 1462-63.

present at the scene." Majority at 16. If the jury believed Zghair and Ruiz-Perez were alone by the time of the shooting, it would be reasonable to infer that Zghair shot the gun, not Ruiz-Perez. But, if the jury inferred that the individual in red was still with them, it would also need to rule out the individual in red as the shooter in order to find Zghair guilty.

The gun was never recovered, and no evidence tied the gun—or any gun—to Zghair. No evidence suggests it is more likely that Zghair possessed and used the gun, rather than the individual in red. At most, the use of the gun and Zghair's car implies that Zghair knew the gun was in the car. But under this theory of liability, the State must prove Zghair acted with intent, not mere knowledge. 1 CP at 123-24. And if the jury believed the individual in red was still with Zghair and Ruiz-Perez during the shooting, "there exist other reasonable conclusions that would follow from the circumstances"—that *either* Zghair or the individual in red shot the gun— and a conclusion that Zghair was the shooter would be only speculative. *State v. Jackson*, 112 Wn.2d 867, 876, 774 P.2d 1211 (1989). In that case, it is equally possible that either Zghair or the individual in red was the shooter. An equal possibility is not enough to meet the standards we have adopted in our case law.

I would conclude the evidence was insufficient to convict Zghair as a principal because the evidence does not support reasonable inferences that he was the shooter or that he intended to assault Ruiz-Perez.

9

B.      Liability as an Accomplice

The State's, and the majority's, primary theory is that the evidence was sufficient for the jury to find Zghair guilty beyond a reasonable doubt as an accomplice to the shooter, the individual in red. I would conclude the evidence is insufficient because it does not support reasonable inferences that would establish mens rea. There are three flaws with the majority's application of the sufficiency of the evidence test as to accomplice liability. First, the majority fails to analyze whether any evidence proves the "knowing" element of the accomplice statute. Second, accomplice liability requires that the accomplice knew the principal would commit a particular crime. No evidence permits a reasonable inference Zghair knew the individual in red intended to commit second degree assault. And third, though I agree with the majority that evidence of the defendant's conduct can *sometimes* be used to prove mens rea, the after-the-fact evidence produced *here* does not provide such proof.

1.      *Knowing Assistance*

Washington's accomplice statute requires the State prove a person "[s]olicits, commands, encourages, or requests" another person to commit a crime or "[a]ids or agrees to aid such other person in planning or committing it" "[w]ith knowledge that it will promote or facilitate the commission of a crime." RCW 9A.08.020(3)(a), (i), (ii); majority at 11 (quoting RCW 9A.08.020(3)). A person acts knowingly when

10

they have actual knowledge or when they have "information which would lead a reasonable person in the same situation to believe that facts exist." RCW 9A.08.010(1)(b)(ii).

The majority emphasizes the Court of Appeals' holding that the State failed to show Zghair knew of a *plan* to commit assault. Majority at 17-18 (quoting and citing *State v. Zghair*, No. 83489-4-I, slip op. at 22 (Wash. Ct. App. Nov. 6, 2023) (unpublished), https://www.courts.wa.gov/opinions/pdf/834894.pdf). The majority goes on to recite the methods of proving accomplice liability such that the accomplice aided, or agreed to aid, in the planning or in the commission of the principal's crime, and so "[t]he State was permitted to establish accomplice liability by proving that Zghair aided another in committing the charged crime." *Id.* at 18; *see* RCW 9A.08.020(3)(a)(ii). While this is true, it is not a complete statement of the law of accomplice liability. The accomplice statute requires that the aid must be done "[*w*]*ith knowledge that it will promote or facilitate the commission of the crime.*" RCW 9A.08.020(3)(a) (emphasis added). In other words, while the majority is correct that actus reus may be established by multiple ways under the statute, it omits mens rea entirely. The State was required to prove not only that Zghair aided a second degree assault but also that he did so *with knowledge* his action would promote or facilitate that crime.

11

> 2. *Knowledge the Assistance Would Facilitate the Commission of an Intentional Assault*

Next, it is not sufficient for an accomplice to know the principal will commit *any* crime; the accomplice must have acted with knowledge they were promoting *the specific* crime for which they are eventually charged. *State v. Cronin*, 142 Wn.2d 568, 579, 14 P.3d 752 (2000); *State v. Roberts*, 142 Wn.2d 471, 510-13, 14 P.3d 713 (2000). Thus, the State had to prove Zghair knew he was assisting in the commission of an intentional assault.

The State's strongest evidence that Zghair knowingly aided in the commission of the assault is probably the use of his car. The car was registered to Zghair and the Chevron video depicted him getting in and out of the driver's seat at 3:25 a.m., so it is reasonable to infer he was the person who drove it to and from the field where Ruiz-Perez was shot within the next hour, or at least that he permitted his car to be driven there. The State equates this to the behavior of a "the getaway driver" who assists in the immediate flight to escape after the commission of a crime. Suppl. Br. of Pet'r at 19. But the act of driving away from the scene of the crime does not establish that one knowingly assisted in the commission of the crime absent any other evidence the defendant knew the principal would commit that crime. *See State v. Luna*, 71 Wn. App. 755, 760, 862 P.2d 620 (1993).

For example, in *State v. Clark*, evidence was sufficient to convict Nathaniel Shane Clark as an accomplice to an attempted bank robbery and a successful bank

robbery when he drove a getaway car for John Kelly Reynolds. 190 Wn. App. 736, 739, 361 P.3d 168 (2015). Evidence showed that Clark and Reynolds were previously incarcerated together when Reynolds told other inmates that if anyone could post bail for him he would pay them back by robbing a bank. *Id*. Clark obtained a bail bond for him and, upon release from jail, Reynolds robbed a bank and paid Clark with the proceeds. *Id*. at 740. The day after that, Clark drove Reynolds to two more banks, where Reynolds went inside wearing a disguise and using a Bluetooth device he used to communicate with Clark, while Clark waited in the car to drive away as soon as Reynolds ran out of the banks. *Id.* at 740-44, 762-63. A rational finder of fact could reasonably infer that at the time Clark assisted Reynolds by driving away from the banks, Clark knew he was assisting in bank robberies because he knew Clark had offered to rob banks and had successfully done so. Here, unlike in that case, the State offered no evidence that the individual in red told Zghair he would shoot someone.

This case is more like *State v. Hanley*, where the evidence was sufficient to convict Laurel Hanley as an accomplice to burglary and theft committed by Kimberly Parsley. 33 Wn. App. 2d 99, 101-02, 559 P.3d 559 (2024). The two rode in Hanley's car to the scene of the crime and, after Parsley entered the building and stole items, Hanley allowed Parsley to use her car to drive away from the property. *Id*. at 101-05. No evidence suggested Hanley knew of any criminal history of Parsley

13

and she did not follow Parsley from one crime to the next. *Id*. at 118. "The State unearthed no conversations between Hanley and Parsley leading to the crimes." *Id*. at 116. Likewise, there is no evidence Zghair knew of any criminal history of the individual in red, and there is no evidence Zghair followed the individual in red from one crime to the next in a way that would alert him that the individual in red might intend to commit an intentional shooting. "The State unearthed no conversations between" Zghair or anyone else leading to the crimes. *Id*. Importantly, the State never identified the individual in red, despite their proximity to the same events as Zghair.

The State next points to the evidence that the shotgun was not found at the scene, so it likely departed in Zghair's car. The State asserts that as owner of the car, Zghair had dominion and control over its contents, including the gun. While it may be reasonable to infer Zghair knew the gun was in the car, it is not reasonable to infer he knew the individual in red would use the gun to intentionally assault Ruiz-Perez. Again, as the police never found the gun, there is no evidence whether it was lawfully possessed or not, or by whom. Whoever owned the gun may have intended to use it for a lawful purpose or not to use it at all. The State asks us to hold that viewing the evidence in the light most favorable to the State means that a gun plus a shooting equals an intentional shooting. But that equation describes speculation, not reasonable inference. The sufficiency of the evidence test requires *some* evidence on

14

which to base a reasonable inference of intent.

There is too little evidence from which to infer Zghair knew the individual in red would commit intentional assault, unlike in *State v. Asaeli*, 150 Wn. App. 543, 572-73, 208 P.3d 1136 (2009). There, several witnesses testified that Benjamin Salofi Asaeli and codefendant Eroni Joseph Williams spoke together at a bar, then left and arrived at a park at the same time, where they went looking for Faalata Fola and confronted him together. *Id.* at 554-57, 573. Williams challenged Fola to a fight and, when the situation escalated, signaled to Asaeli, who immediately stepped forward and shot Fola. *Id.* at 555-57, 573. A jury could reasonably infer Williams knew Asaeli was there to assist in the confrontation based on witness testimony that Williams and Asaeli had conversed and their physical positions and behavior throughout the night. *Id.* at 573.

Here, there is no evidence Zghair and Ruiz-Perez had ever met before. There is no evidence whether, or how, the individual in red knew Zghair or Ruiz-Perez. There is no evidence of *any* conversations among Zghair, the individual in red, or Ruiz-Perez. *Compare State v. Lazcano*, 188 Wn. App. 338, 365, 354 P.3d 233 (2015) (evidence sufficient to convict as accomplice to burglary where, in addition to evidence, the principal and accomplice traveled to the victim's home together, witnesses testified about conversations between accomplice and principal about confronting the victim), *and Asaeli*, 150 Wn. App. at 573 (evidence of Williams'

15

knowledge Asaeli would shoot Fola included several members of their group calling out asking for Fola), *with Asaeli*, 150 Wn. App. at 569 (evidence insufficient to convict a third codefendant, Darius Asafo Vaielua, who was present at the scene of the shooting and drove Williams and others in the group to the scene, but there was no evidence that any of Vaielua's conversations that evening "related in any way to a plan to shoot or assault Fola"). And there is no evidence about their physical positions or behavior in the moments leading up to the assault. *Cf. In re Pers. Restraint of Arntsen*, 2 Wn.3d 716, 729, 543 P.3d 821 (2024) (witness descriptions of Arntsen's movement and body language sufficient evidence to prove intent to create apprehension of imminent harm); *see also Asaeli*, 150 Wn. App. at 573 (witnesses described Williams' movement and position in relation to Asaeli and Fola).

Finally, the State contends the totality of the circumstances, including the late hour and location of the field, support an inference that Zghair knew the individual in red would intentionally assault Ruiz-Perez. But as the State acknowledges, there are all kinds of reasons people might be out late at night in relatively unattended areas, ranging from using or selling drugs to mundane and lawful activities. 31 RP (Oct. 7, 2021) at 2568. The time, location, and presence of a gun do not add up to knowledge that would lead a reasonable person to believe that another person planned to commit the specific crime of intentional assault with the gun when there

16

are many other reasonable conclusions one could draw about what the shooter intended or what Zghair knew. *Jackson*, 112 Wn.2d at 876 ("An inference should not arise when there exist other reasonable conclusions that would follow from the circumstances."). It cannot be the rule, as the State suggests, that any time people are out late at night with a gun, more likely than not one of them will use the gun to intentionally assault someone, and another knows it. A conclusion that requires such logical leaps to reach is one based on speculation, not reasonable inferences.

      3.      *Conduct After the Crime Indicating Mental State at the Time of the Crime*

Last, the majority fixates on the Court of Appeals' distinction between conduct during and after the crime, but it largely misses the point. The question in this case is not whether evidence of the defendant's conduct after the crime can ever be used to prove the elements of the crime—the issue is whether the after-the-fact evidence here actually did so.

Below, the Court of Appeals recognized the legal distinction between assisting in the *planning or commission* of a crime and rendering *assistance after another commits a crime*. *Zghair*, slip op. at 13 (citing *State v. Anderson*, 63 Wn. App. 257, 261, 818 P.2d 40 (1991)). A person can be liable as an accomplice for a crime committed by another when they aid the commission of a crime, as alleged here. RCW 9A.08.020(3). But rendering criminal assistance—such as by providing transportation to a person one knows has committed a crime or by concealing or

17

altering evidence—is a separate offense altogether relating to conduct after another crime has been committed. RCW 9A.76.050. Zghair was not charged with rendering criminal assistance. *See* 1 CP at 1. "An accomplice is liable because he or she knowingly aids the criminal enterprise of another *before* the fact. RCW 9A.08.020. One who renders criminal assistance is liable because he or she knowingly aids the criminal enterprise of another *after* the fact. RCW 9A.76.050." *Anderson*, 63 Wn. App. at 261 (emphasis added); *see also Hanley*, 33 Wn. App 2d at 107 (the accomplice statute "employs verbs that describe actions preceding the crime, not conduct that helps the offender after he or she commits the crime," which "constitutes a distinct crime" of rendering criminal assistance).

Neither *Anderson* nor *Hanley* held, as the majority asserts, that there was insufficient evidence to establish accomplice liability because the evidence showed only that the defendant knowingly aided in the crime after the fact. *See* majority at 22-23. *Anderson* was not an accomplice liability case at all. In *Anderson*, the defendant was convicted of rendering criminal assistance. 63 Wn. App. at 258. The issue in that case was whether, to prove the elements of that crime, it was sufficient to show that at the time of rendering the assistance, the defendant knew they were assisting someone who had committed a robbery. *Id.* at 260. The court concluded that level of specificity in the defendant's knowledge was sufficient, and it was not necessary to prove the defendant knew the *degree* of

18

robbery committed. *Id. Anderson* said nothing about whether or how a defendant's behavior after another person commits a crime proves accomplice liability. It compared the accomplice liability and criminal assistance statutes to explain its reasoning as to the specificity of knowledge required: "Because the goal in both cases is to punish for knowingly aiding the criminal enterprise of another, there is no reason to require that the renderer have more specific knowledge than the accomplice." *Id.* at 261.

Hanley was an accomplice liability case, but the temporal issue was not about *when Hanley knew* she was assisting Parsley's crimes. 33 Wn. App. 2d at 101. The issue was whether the she assisted in the *commission* of the burglary and theft or only assisted after the fact. *Id. Contra* majority at 22-23. In that case, the court noted that the State presented no evidence Hanley knew Parsley intended to commit a crime, but even "[a]ssuming the State presented evidence sufficient to convict Hanley of knowingly aiding Parsley," the evidence was insufficient to prove she aided in the commission of the crimes. *Hanley*, 33 Wn. App. 2d at 101. The only reasonable inference of assistance would be that Hanley opened the back of the car for Parsley to place the stolen items. *Id*. at 117. But the evidence was insufficient as to the aid element of accomplice liability because "Parsley completed her burglary and theft before she returned to Hanley's car. Assuming Hanley committed a crime, she committed an uncharged crime" of rendering criminal assistance. *Id*.

Those cases distinguished accomplice liability from the distinct offense of rendering criminal assistance based on when the unlawful conduct occurs. They did not rule out the possibility that "a putative accomplice's conduct or statements that occur after the commission of the crime may help establish that they had actual knowledge of their promotion or facilitation of the charged crime." Majority at 22-23. I agree that a defendant's behavior after the fact might be relevant to prove accomplice liability. However, the evidence the State produced of Zghair's behavior after the shooting in this case does not support a reasonable inference he knowingly aided the commission of an intentional assault at the time he offered that assistance—the most one can reasonably infer from it is that after the fact, Zghair knew *a* shooting (not necessarily an intentional one) had occurred.

For example, the State points to the way Zghair's car was left parked for over a week as evidence that he "cleaned, altered, and abandoned his car" to hide evidence of the crime. Suppl. Br. of Pet'r at 1, 27. However, the State's evidence showed that the car was parked next to apartments, it did not smell of any cleaning agent, and it contained stains and debris as well as the registration and other documents showing Zghair's ownership; someone removed a sticker but also moved the license plate to its *proper* location on the front bumper. 22 RP (Sept. 21, 2021) at 1397; 23 RP (Sept. 22, 2021) at 1636, 1653-54, 1657-58; 27 RP (Sept. 29, 2021) at 2126. It is not reasonable to infer from the fact that Zghair left the car in a populated area with the

20

registration documenting his ownership and the license plate properly affixed to the front bumper that he tried to conceal evidence he knowingly assisted in an intentional assault with a firearm. Even if that evidence could support a reasonable inference that Zghair tried to hide evidence because he knew the car was involved the shooting, proof of *knowledge of the crime after the fact* does not equate to proof of *intent to commit the crime*. Moreover, actions that might try to shield himself from liability afterward tell us nothing about what Zghair knew of the individual in red's intentions or actions on the night of the shooting.

Similarly, the State points to Zghair's attempt to travel to Canada using someone else's identification and subsequently running from authorities when he and his party returned to the U.S. border. Again, equally plausible explanations exist for his running away: he may have feared he would get in trouble for attempting to use someone else's identification. Even if we could reasonably infer Zghair was attempting to avoid authorities, an attempt to leave the country could support a conclusion that he knew of the shooting because he was involved, but it does not support a reasonable inference about him forming the intent to commit an assault three weeks earlier if he were the principal. *Cf. State v. Hummel*, 196 Wn. App. 329, 356-57, 383 P.3d 592 (2016) (evidence the defendant disposed of decedent's body and concealed her death was evidence of guilt that the defendant killed her, but did not prove premeditation). Further, if the individual in red were the principal,

Zghair's avoidance of the authorities three weeks later tell us nothing about what Zghair knew of the individual in red's intentions on the night of the shooting.

I would conclude the evidence was insufficient to convict Zghair as an accomplice. While the evidence supports inferences that Zghair knew the gun was in the car, was present during the shooting, drove the car away from the shooting, and knew afterward that a crime had been committed, it does not support reasonable inferences that he knew the individual in red would intentionally assault Ruiz-Perez with a deadly weapon or that he knowingly assisted in the commission of that specific crime. Instead, a reasonable trier of fact could reach that conclusion based only on speculation, so the evidence was not sufficient to prove every element of the crime beyond a reasonable doubt.

## CONCLUSION

In this case, no evidence would permit a reasonable inference that Zghair (a) intentionally committed the shooting himself or (b) aided the unidentified third person in planning or committing an intentional assault with the knowledge his assistance would facilitate that specific crime. I would therefore hold the evidence was not sufficient to convict Zghair as either a principal or an accomplice. Holding to the contrary, the majority today effectively forecloses the possibility of any successful challenge to the sufficiency of the evidence, holding that a trier of fact may infer intent to assault, knowledge another would commit assault, and aiding the

22

commission of an intentional assault when no circumstantial evidence makes those

inferences reasonable. I respectfully dissent.

_____
Montoya-Lewis, J.

_____
Gordon McCloud, J.

23